CADMUS, The (BROWN v.). See Case No. 1,997.

## Case No. 2,282.

### The CADMUS v. MATTHEWS et al.

[2 Paine, 229.] [1]

Circuit Court, D. New York. Dec., 1830. [2]

DEVIATION—SEAMEN'S WAGES—ACCRUAL OF RIGHT OF ACTION FOR—FORFEITURE FOR DESERTION—ENTRY IN LOG-BOOK.

1. The question as to deviation in a voyage, is open to proof, and cannot be decided as matter of law. It relates to usage and the course of trade, and is to be determined as a question of fact upon the evidence introduced by the parties, and cannot be judicially noticed by the court as a question of law.

[See note to Case No. 2,118.]

2. Where seamen are discharged by the master before the expiration of the time specified in the shipping articles, a right of action for their wages accrues immediately, and they need not wait until the expiration of the period for which they shipped.

3. The entry in the log-book, in order to lay the foundation for a forfeiture of wages, under the act of congress,—2 Bior. & D. Laws, 117 [1 Stat. 133, § 5],—must state substantially that the absence was without leave. Such entry must be made on the same day the seaman absented himself; and it can take effect only from the day when made.

4. Although seamen who have absented themselves, come on board again within the forty-eight hours allowed them by the act [1 Stat. 133, § 5], yet if they refuse to do duty, it is not a return within the meaning of the act. The return in order to save a forfeiture of wages, must have been unconditional, and a return to duty generally.

5. In the United States, independently of the act of congress, the general doctrine of the marine law as to the nature and effect of desertion has been uniformly recognized; and is uniformly held to incur the penalty of forfeiture of all wages antecedently due.

6. It is the duty of the court to watch over and protect the rights of seamen; and although they should be held strictly to the great and leading objects of their contracts, yet, when minor and less important stipulations are drawn in question, it ought to apply to them very liberal and equitable considerations.

[Appeal from the district court of the United States for the district of New York.

[In admiralty. Libel by Charles Matthews and others against the brig Cadmus for wages. There was a decree for libellants in the district court (see Case No. 2,280), and Hall and Curtis, owners of the brig, appeal.]

THOMPSON, Circuit Justice. This cause comes up on appeal from a decree of the district court, by which the respondents were allowed the amount of wages claimed for services as seamen, on board the brig Cadmus. This claim was resisted by the appellants on two grounds: 1. That the voyage had not terminated when the proceedings were commenced; and, 2. That the seamen had forfeited their wages. The voyage as described in the shipping articles, is, "From the port of Boston to port or ports in the West Indies, and back to port or ports in the United States, one or more times, for

[1] [Reported by Elijah Paine, Jr.]
[2] [Reversing Case No. 2,280.]

and during the term of six months, from the 25th day of September, 1829."

This suit was commenced before the expiration of the six months, on the ground that the seamen were discharged from their contract, either actually by the master, or by operation of law by reason of an alleged deviation. The deviation set up in the libel is, that from St. Thomas, in the West Indies, the voyage was continued to Maracaibo on the Spanish Main, before returning to the United States. The answer denies that this is any deviation, but alleges that Maracaibo is a port in the West Indies, within the meaning of the shipping articles, and is so considered by nautical and mercantile men conversant with voyages to the West Indies. The case was left upon these allegations in the pleadings, without any proofs on the one side or the other, and the district court pronounced no opinion upon the point. It was a question properly open to proof, and not one which the court can decide as matter of law; it is a question relating to usage and the course of trade, and is to be determined as a question of fact upon the evidence introduced by the parties, and cannot be judicially noticed by the court as a question of law. I am not, therefore, called upon to decide this question, as it seems to have been waived by the libellants, and passed by without any opinion expressed by the district court.

The questions upon which the cause turned in the court below were, that in point of fact the seamen were discharged by the master in the port of New York, before the expiration of the six months, and that they had not, by anything that had taken place, forfeited their wages. If the seamen were discharged by the master in the port of New York, there can be no doubt but that a right of action accrued immediately, and they were not bound to wait until the expiration of six months. It becomes an important point, therefore, to inquire how the evidence stands upon this question; and the bearing of this evidence will be better understood by seeing what are the allegations in the libel with respect to the voyage for which the seamen shipped, and the discharge set up by them. The libel describes the voyage to be "from the port of Boston to St. Thomas, from thence to Wilmington, N. C., from thence to one or more ports in the West Indies, and from thence back to a port in the United States." And it is then alleged, that the Cadmus arrived in the port of New York on the 25th day of December, in the same year, and that three of the libellants, Matthews, Estrom and Smith, were on the same day discharged; and that Harrison was discharged on the second day of January thereafter. It is very evident that the proctor who drew this libel had not the shipping articles before him, or he would not have so misdescribed the voyage; and from the testimony of some of the seamen, it is equally clear that they had forgotten or were ignorant of the voyage for which they shipped. The libel appears to be shaped on the assumption that the voyage ended on the return of the vessel to a port in the United States, and such would seem to have been the understanding of the seamen; and that the question first raised by the seamen was, whether they were bound to unlade the cargo before they were entitled to their discharge, and not whether they were bound to remain the six months, according to the shipping articles. And the libel accordingly alleges the discharge, in fact, on the very day the brig arrived in New York. The evidence, however, is entirely insufficient to support this allegation, and it was not relied upon by the district court; but the discharge is placed upon what took place at a subsequent day. The evidence in support of the alleged discharge on the 25th of December, is, that several of the seamen swear, that, whilst they were making the vessel fast, the captain told the mate that when he had made her fast, he should let the men go ashore; and that after they had made her fast, the mate told the men they might go ashore and go to hell, if they liked. This language, although extremely reprehensible in the mate, could not have been intended by him, or understood by the seamen, as a general discharge from the brig. The order of the captain to the mate was given in their hearing, and must have been understood by them as a mere permission to go ashore for a short time, according to the usual practice on the arrival of a vessel in port; and the whole conduct of the seamen afterwards shows that such was their understanding of the permission. But it is unnecessary to pursue the evidence on this point, as it was disregarded by the court below, and has not been relied upon by the respondents in this court.

The discharge relied upon by the district court, and which has been pressed upon the argument of the case here, is inferred from what took place on the 6th or 7th of January. It does appear from the testimony of several of the seamen, that the captain did declare to Matthews, Smith and Estrom, that he had nothing more to do with them; that he did not know them any more than men that never sailed with him. This, it will be perceived, was eleven or twelve days after the arrival of the brig; and to a right understanding of the force and effect of this declaration of the captain, we must look at the attending circumstances, and what had previously taken place between the captain and the seamen, with respect to their refusing to do duty on board the brig. These three men had done no duty on board the vessel after the 25th of December, the day of her arrival; although they were occasionally on board, and at some times intimated a willingness to assist in discharging the cargo, but utterly refused to do duty generally. Under these circumstances, and according to

the testimony of Matthews, they came on board on the 6th or 7th of January, and told the mate they were willing to discharge the cargo. The captain was not on board, but soon after came, and the mate told him the men were willing to discharge the cargo: to which the captain replied, that he had nothing more to do with them; that he did not know them any more than men that never sailed with him. The other two seamen state substantially the same thing, except that they do not state that the offer to work was confined to the unlading of the cargo. But the statement made by Matthews corresponds in this respect with that of the mate, who testifies that these three seamen had, some days before, been on board, and the captain asked them if they would go to their duty, and they said they would not; they then went away and remained until the day above mentioned, when he says they came on board and offered to discharge the cargo, but did not offer to do duty generally; that the captain was not on board, but soon after came, and then told them that he had given them every opportunity to return to their duty; that he had offered to receive them after they had been absent forty-eight hours or more, but that they had refused; and that now, having been absent four or five days, they might get along with it the best way they could, and that since that time they had not been on board. On his cross-examination, he states that when the captain told them they must do the best they could with it, one of the men asked, "Then you do not want us?" to which the captain replied, "No, I will have nothing more to do with you." Under these circumstances, I cannot think that these declarations of the captain ought to be considered a discharge of the seamen from their contract as contained in the shipping articles. It is reasonably to be inferred from the conduct of these men, that they were ignorant of their engagement under the shipping articles, and that they considered their term of service ending at the port of New York, and that the only question with them was, whether they were bound to unlade the cargo. After such a course of conduct, in violation of their duty, and the express terms of their contract, and after the cargo had been discharged, the reply of the captain to the offer made by them to discharge the cargo, that he would have nothing more to do with them, can admit of no other reasonable construction than a declaration to them: "You have taken your stand; you have put yourselves upon what you consider your legal rights; you must do the best you can with it, I will have nothing more to do with you." If this is a fair and reasonable conclusion from the evidence in the case, as I think it is, then nothing has taken place on the part of the captain that can be considered an absolute or constructive discharge of the seamen; and if they were not discharged, it follows, as matter of course,

that no proceedings could be instituted by them for the recovery of wages until the expiration of the six months, according to the shipping articles. But it becomes important to inquire whether there was a forfeiture of wages by any or all of the respondents, or whether the present proceedings were only prematurely commenced.

I entirely concur in the opinion of the district judge, that the entry in the log-book, in order to lay the foundation for a forfeiture of wages under the act of congress,—2 Bior. & D. Laws, 117 [1 Stat. 133],—must state substantially the absence to be without leave; and that such entry must be made on the same day the seaman absented himself, that is, the entry can take effect only from the day when made. Such are the plain and explicit requirements of the act. The entry in the log-book on the 26th of January, as to two of the respondents, is as follows: "John Smith and Charles Matthews have been absent from the vessel during the day without permission." This entry as to them is sufficient, and the forty-eight hours began to run from that day; and the question is, whether they afterwards returned to their duty, so as to stop the time running against them, and save the forfeiture. The evidence, independent of the log-book, is very conclusive to show that these men, although they came on board again within the forty-eight hours, absolutely refused to do duty. Was such appearance accompanied by a refusal to do duty, a return within the sense and meaning of the act? I think it was not. It cannot be necessary, in order to bring the case within the act, that the seaman should keep himself concealed and beyond the reach of the captain. If he presents himself on board the vessel, the master might probably have the right to cause him to do duty; but the law does not impose upon him the necessity of exercising force. He may rely upon the more mild and peaceable redress provided by the shipping articles, and the law applicable to the case; and I should say, generally speaking, when the vessel is in a home port, and the place of the seaman can be supplied, coercive measures had better be avoided. The absence contemplated by the act must mean a total withdrawing himself from his duty as a seaman. He is, in such case, as to every beneficial purpose, absent. It appears to me to be inconsistent with the spirit and object of the act to permit the seaman to redeem the time, by appearing from day to day, and insulting or treating with contempt the authority of the captain. The return of the seaman, which shall save the forfeiture, is, according to the language of the act, a return to his duty within the forty-eight hours: and can it be said, that his personal presence, accompanied by an absolute refusal to do duty, is a return to his duty? This, it appears to me, involves an inconsistency that ought not to be allowed in the construction of the act; nor would it, in my judgment, have saved the forfeiture, if

these men had, within the forty-eight hours, returned and offered to discharge the cargo. Such a qualified return to duty would not have been a compliance with the law, the voyage for which they shipped not being ended. It should have been unconditional, and a return to duty generally. Not having been discharged by the captain their term of service had not expired, and they were then as much under obligation to do duty generally as at any time during the voyage. In the case of The Bulmer, 1 Hagg. Adm. 163, it was decided that a mariner had incurred a forfeiture of his wages by neglecting or refusing to return to his ship when required by the master, although previously absent by leave. In that case, the mariner had permission to leave the ship to perform some work for the British consul at Tangier, and refused to return when required by the captain. The defence to the claim of the mariner for wages was, that this refusal to return to his duty constituted a desertion: and Lord Stowell observes, that the mariner, being absent by permission, was entitled to his wages, unless they were forfeited by his subsequent misconduct; that it does not appear that there was any specific mention of a return to the ship, but it belongs to the nature of the thing: he who retires under a permission, goes with the stipulation of a return when the ship requires him; and that the evidence was clear, that to the applications made to the mariner to return, his answers were a distinct refusal, and given in terms of reproach; and that he would not countenance the claim to wages. In this case, the mariner did not secrete himself; he was within reach of the master. But this did not save the forfeiture; that was incurred by a refusal to return to his duty when required. The same rule is laid down in Abbott on Shipping (page 463, by Story), that, if a mariner quit the ship with leave of the master, and when ordered to return, refuses to do so, his wages are forfeited. It is also stated by the same author, that desertion from the ship is held to be a forfeiture of wages previously earned, in all maritime countries (page 463); and the learned editor of that work, in a note to his last edition (page 463, note 1), says, it may be generally stated that in America, independent of the act of congress, the general doctrine of the marine law, as to the nature and effect of desertion, has been uniformly recognized. It is uniformly held to incur the penalty of forfeiture of all wages antecedently due, and that to constitute a desertion, there must be a voluntary departure without reasonable cause.

With respect, therefore, to Matthews and Smith, their cases, I think, are brought within the act of congress, and that they have forfeited all claim to wages. With respect to the other respondents, their cases must be considered unaffected by any entries in the log-book. They are not included in the entry of the 26th of December; and all the other entries, down to the 7th of January, are defective, and not in compliance with the requisites of the act of congress: and this last entry must be laid out of view, having been made after the commencement of the proceedings in this case. I have looked with considerable attention, and not without some wish, to find in the cases of the other two respondents, Estrom and Harrison, something upon which I might distinguish their cases from those already noticed, and protect them from an absolute forfeiture of their wages; but I have been unable to find any safe and satisfactory ground upon which to stand. They certainly appear in a less blamable point of light; and there is reason to conclude they were influenced by the bad example, if not by the persuasions of Matthews and Smith. They returned on board the morning after leave had been given them to go on shore and perform some trifling service, and seemed to manifest some disposition to return to their duty; for, on being told by the captain that they were not discharged, and that they must continue to do duty on board, they said they were perfectly satisfied. This was on Saturday; but on Monday morning Estrom came on board with Smith and Matthews, and the captain asked them if they would go to their duty, and they all said they would not, and went away, and did not afterwards return and offer to do duty, except on one occasion, when they offered to unlade the cargo; but even this was after it had been discharged: and although Harrison continued doing duty until the second of January, he then declared that he had found another vessel, and that he did not intend to do any more work on board, and left the vessel without leave of the captain or mate, and did not afterwards return to his duty. Here was, therefore, an abandonment of duty both by Estrom and Harrison, and a voluntary withdrawing or departure from the vessel without leave and without any reasonable cause, and which, according to the authorities I have referred to, constitute a desertion under the marine law, and work a forfeiture of wages; and in the act of congress on this subject, absence without leave is spoken of as importing the same thing as a desertion.[3]

---

[3] Mr. Abbott (Tr. Shipp. pt. 4, c. 3, § 4) says: "Neglect of duty, disobedience of orders, habitual drunkenness, or any cause which will justify a master in discharging a seaman during a voyage, will also deprive him of his wages." Judge Story, in the case of The Mentor [Case No. 9,427], comments upon the foregoing language of Mr. Abbott, as follows: "In a limited and restricted sense the proposition here stated may be, and doubtless is, true. But it is not a single neglect of duty, or a single act of disobedience, which ordinarily carries with it so severe a penalty. There must be a case of high and aggravated neglect or disobedience, importing the most serious mischief, peril or wrong; a case calling for exemplary punishment, and admitting of no reasonable mitigation; a case involving a very gross breach of the stipulated contract for hire, and

In considering the obligations of seamen, arising out of their contract in their shipping articles, according to the formula in common use, due weight ought to be given to the character and situation of this class of men. Generally ignorant and improvident, and probably very often signing the shipping articles without knowing what they contain, it is the duty of a court to watch over and protect their rights, and apply very liberal and equitable considerations to the enforcement of their contracts; particularly when are drawn in question the minor and more unimportant stipulations that are usually thrown into the shipping articles. But with respect to the great and leading objects of the contract, viz., the designation and agreement, on the part of the ship-owner, with respect to the intended voyage, and the engagement, on the part of the seamen, to serve for certain stipulated wages during such voyage, they are so plain and simple,

---

going, in its character and consequences, to the very essence of its provisions. The only authority cited in support of the proposition by the learned author, shows, that it must have these limitations attached to it." Where freight has not been earned wages are not due; and it makes no difference that there has been a salvage of part of the cargo. Dunnett v. Tomhagen, 3 Johns. 154. In this case, the defendant below pleaded the general issue, with notice of special matter. The cause was tried before the justices, by consent, but without a jury, and the following facts appeared:—The plaintiff was a mariner on board the Sarah, on a voyage from New York to Greenock and back at twenty-two dollars per month. That the ship performed the voyage to Greenock in safety, and was abandoned as a wreck on her homeward voyage, after being from port two months. The crew, in order to save the cargo, threw overboard their own clothes and other property. By their exertions they saved from the ship, so abandoned as a wreck, seven boxes of merchandise, which they stowed in the long-boat, and then left her. After being some time at sea, they were taken up by the sloop Morning Star, and arrived safe at New York with the long-boat and merchandise. The property so saved and the long-boat were libelled in the district court, at New York, by the crew of the sloop Morning Star for salvage. After the merchandise and long-boat were in the custody of the marshal, an agreement was made between the libellants and the owners of the merchandise, (the plaintiff being in nowise privy thereto,) that the property should be sold at auction, and that, from the proceeds, the auctioneer should pay to the libellants such sum as should be awarded for salvage by two arbitrators, who awarded a sum in favor of the libellants, but how much did not appear. The seven boxes of merchandise were owned by sundry merchants in New York, and the captain and owners of the Sarah had no interest in them beyond their lien (if any) for freight. The outward wages only had been paid to the plaintiff. The plaintiff and all the crew gave receipts in full; and when the receipts were demanded by the owners, they informed the men that they should not have their wages unless they signed them. The mate and one seaman refused, and the plaintiff signed his mark, but received his pay for the outward voyage only. The boxes of merchandise sold at auction for 1,600 dollars. The wages due to the crew on the homeward voyage, at the time the ship was abandoned, amounted to 414 dollars. The court below decided that the Sarah could not, in contemplation of law, be considered as wrecked, nor the merchandise and long-boat in such a state of peril as to entitle the crew of the Morning Star to salvage, to the prejudice of the seamen; that as the owners had received the goods, and thus entitled the captain of the Sarah to his freight therefor, and that as sufficient had been saved to pay the seamen's wages, and as the plaintiff had made a sacrifice of his own property to save that put into the long-boat, the court, in the exercise of their legal and equitable powers, gave judgment for the plaintiff for his two months' wages, from the time of the departure of the ship from Greenock to her abandonment at sea.

Chief Justice Kent, in delivering the opinion of the court, said:—"It is the general rule of the marine law, that freight is the mother of wages, and that the safety of the ship is the mother of freight. The reason of the rule is, that the seamen may have an interest in the safety of the ship, and may thereby be induced not to desert her in cases of danger, but to use their utmost endeavor, even at the hazard of their lives for her preservation. No freight was earned in this case on the homeward voyage, because no part of the cargo was delivered by the ship. The contract was not fulfilled; the voyage was not performed; and no freight was earned: it follows, as a necessary consequence, that no wages were due. The salvage of part of the cargo does not take this case out of the general rule, because no freight was earned by the ship on the goods saved. It is not the saving of the cargo, but the earning of freight, that entitles the seamen to wages. The owners of the ship had no valid claim for freight, as for a part performance of the entire contract, because the fulfilment of the contract was not dispensed with by any act of the owners of the goods, nor, indeed, was there even a part performance by the owner of the ship. A salvor, and not ship-owner, was here the deliverer of the goods saved. The seamen might, perhaps, have had a valid lien on the goods saved, for an equitable compensation, in the light of salvage, but this gave them no right of action against the ship-owners or master, on their contract for wages. The claims of salvage and for wages are totally distinct, and are to be tested by different rules. It must, however, be admitted, that the loose manner of using these terms in some of the books, and in the old marine codes, tends to mislead; but the confusion is easily cleared when the terms themselves, and the principles upon which those claims respectively rest, come to be understood and applied with due precision."

The general rule of maritime law is, that if freight be lost during the course of the voyage by disaster or peril, arising from accident or superior force, the seamen lose their wages; but if the same be lost by the fraud or other wrongful act of the master, the reason of the rule does not apply. It is just, as well as agreeable to the maritime law, to distinguish between the cases in which the services of the seamen have not been rendered, in consequence of the perils at sea, and in which they have not been rendered, by reason of the act of the master or owner. If a seaman be wrongfully discharged from the service, his wages will still continue down to the termination of the voyage. Abb. Shipp. 354. So if the voyage be interrupted and lost, by the act of the master or owner, the seamen have a valid claim for an adequate compensation. The maritime ordinance of Lewis XIV. (des Loyers des Matelots, art. 3) provides for this case, by ordaining that if the voyage be broken up, after it has commenced, by the act of the owner or master, the seamen hired for the voyage shall be paid their entire wages for the voyage, and those hired by the month the wages due for the time

and so easily understood, and so intimately connected with the interests of navigation, that a strict compliance with the contract, in these respects, ought to be enforced. I am the less reluctant to decree a forfeiture of wages in this case, because the amount in question is very inconsiderable; and the example, I hope, may have a beneficial effect upon seamen, to let them understand that they are not to abandon a vessel for light and trifling causes, before the termination of the voyage for which they have shipped.

---

they had served, and for the time necessary to enable them to return to the port of departure. "The master," says Pothier. in his remarks on this article (Louage des Matelots, note 203), "ought not to be discharged from his engagements, because the breaking up of the voyage was his own act, and a debtor cannot, by his own act, discharge himself of his obligation." The judgment in the court below was conformable to this rule of the French law; and the rule on this subject in the English law does not, as I apprehend, differ from the marine law of France, though I have not met with any adjudged case that is in point, and a recent nisi prius decision looks strongly the other way. In Eaken v. Thom, 5 Esp. 6, Abb. Shipp. (3d Ed.) 444, it was ruled by Lord Ellenborough, that if a ship be not seaworthy when she sails, and the voyage is lost by that means, the seamen cannot recover their wages; for the rule is general, that the ship must perform her voyage to entitle the seamen to wages; and the neglect of the owner, in sending out an unseaworthy ship, might be the object of a special action on the case. Whether the loss of freight, by reason of the want of seaworthiness in the vessel, forms one of the exceptions, I am not prepared to say; but the rule that the voyage must be performed is certainly not universal, and without exception. A voyage lost by the fraud or misconduct of the master, and that so palpable as not to be denied, is not within the reason of the maxim, that freight is the mother of wages. The policy of the rule was well and distinctly assigned in a case in 1 Sid. 179, where it was held, that if the ship perish by tempest, enemies, fire, &c.. the mariners lose their wages, "for if the mariners were to have their wages in those cases, they would not use their endeavors, nor hazard their lives for the safety of the ship." The counsel for the plaintiff. in the case of Abernethy v. Landale. Doug. 539, stated it to have been held, that if a ship be seized for debt, or for having contraband goods on board, the sailors had a right to their wages up to the time of the seizure. What decision or authority was alluded to does not appear; but this is undoubtedly the settled doctrine in the treatises on the English marine law. In "the discourse of owners and masters of ships and mariners," contained in the "Sea Laws" (page 457) it is stated as the rule of law, that "if a ship happens to be seized for debt, or otherwise to become forfeited, the mariners must receive wages, unless in some cases where the wages are forfeited as well as the ship; as if they have letters of marque, and instead of that they commit piracy, by reason of which there ensues a forfeiture of all. But lading prohibited goods on board a ship, as wool and the like, though it subjects the vessel to a forfeiture, yet it does not deprive the mariner of his wages; for the mariners having honestly performed their parts, the ship is tacitly obliged for their wages." The same doctrine is maintained in Malynes' Lex Mercatoria (page 105) and in the collection of sea laws annexed to Malynes. We may. therefore, consider this a rule of the marine law both in France and England.

The decree of the district court must, accordingly, be reversed, and the libel dismissed.

[NOTE. A seaman who deserts the service of the ship forfeits wages previously earned. Coffin v. Jenkins. Case No. 2,948; The Rovena, Id. 12,090; Burton v. Salter, Id. 2,218; The John Martin, Id. 7,357; The Philadelphia, Id. 11,084; The Swallow, Id. 13,664; The Merrimac, Id. 9,474. The desertion must occur during the voyage. The Martha, Id. 9,144; Francis v. Bassett. Id. 5,037; Cloutman v. Tunison, Id. 2,907. The forfeiture is discretionary with the court. Gifford v. Kollock, Id. 5,409; Swain v. Holland, Id. 13,661; Lovrein v. Thompson, Id. 8,557; The Union, Id. 14,347; The Balize, Id. 809. Quitting the ship with intention not to return is desertion. The Balize, supra; The Union. supra; The Catawanteak, Case No. 2,-510; The Rovena, supra; Hart v. The Otis, Case No. 6,154; Hayes v. The J. L. Wickwire, Id. 6.262; Costello v. American Steamship Co., Id. 3 263; The Ericson, Id. 4,510; Scully v. The Great Republic, Id. 12,571. To forfeit wages for desertion under the act of 1790, an entry of the desertion must be made in the log book. Magee v. The Moss, Id. 8,944; Cloutman v. Tunison, supra; The Phoebe v. Dignum, Case No. 11,110; The Hercules, Id. 6,401; Wood v. The Nimrod, Id. 17,959; Brower v. The Maiden, Id. 1,970; The Catawanteak, supra; Knagg v. Goldsmith, Case No. 7,872; Bray v. The Atlanta, Id. 1,819; The T. F. Whiton, Id. 13,849; Hart v. The Otis, Id. 6.154. As to what should be entered, see The Hercules, supra; Wood v. The Nimrod, supra; The Catawanteak, supra; Ulary v. The Washington, Case No. 14,-323; Snell v. The Independence, Id. 13,139.]