## ROBERTSON v. BALDWIN.[1]

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF CALIFORNIA.

No. 334.  Argued December 15, 1896. — Decided January 25, 1897.

Section 4598 of the Revised Statutes is not unconstitutional by reason of
its authorizing justices of the peace to issue warrants to apprehend
deserting seamen, and deliver them up to the master of their vessel.

The judicial power of the United States is defined by the Constitution, and
does not prevent Congress from authorizing state officers to take
affidavits, to arrest and commit for trial offenders against the laws of the
United States, to naturalize aliens, and to perform such other duties as
may be regarded as incidental to the judicial power, rather than a part
of it.

Section 4598 and 4599, in so far as they require seamen to carry out the
contracts contained in their shipping articles, are not in conflict with the
Thirteenth Amendment forbidding slavery and involuntary servitude; and
it cannot be open to doubt that the provision against involuntary servitude
was never intended to apply to such contracts.

The contract of a sailor has always been treated as an exceptional one,
and involving to a certain extent the surrender of his personal liberty
during the life of the contract.

THIS was an appeal from a judgment of the District Court
for the Northern District of California, rendered August 5,
1895, dismissing a writ of *habeas corpus* issued upon the peti-
tion of Robert Robertson, P. H. Olsen, John Bradley and
Morris Hansen.

The petition set forth, in substance, that the petitioners
were unlawfully restrained of their liberty by Barry Baldwin,
marshal for the Northern District of California, in the county
jail of Alameda County, by virtue of an order of commitment
made by a United States commissioner, committing them for
trial upon a charge of disobedience of the lawful orders of the
master of the American barkantine Arago; that such com-

---

[1] The docket title of this case is "Robert Robertson, P. H. Olsen, John
Bradley and Morris Hansen v. The United States and Barry Baldwin, indi-
vidually and as marshal of the United States in and for the Northern District
of California."

mitment was made without reasonable or probable cause, in this: That at the time of the commission of the alleged offence, petitioners were held on board the Arago against their will and by force, having been theretofore placed on board said vessel by the marshal for the District of Oregon, under the provisions of Rev. Stat. § 4596, subdivision 1, and §§ 4598, 4599, the master claiming the right to hold petitioners by virtue of these acts; that §§ 4598 and 4599 are unconstitutional and in violation of Section 1 of Article III of, and of the Fifth Amendment to, the Constitution; that § 4598 was also repealed by Congress on June 7, 1872, 17 Stat. 262, and that the first subdivision of § 4596 is in violation of the Thirteenth Amendment, in that it compels involuntary servitude.

The record was somewhat meagre, but it sufficiently appeared that the petitioners had shipped on board the Arago at San Francisco for a voyage to Knappton in the State of Washington; thence to Valparaiso; and thence to such other foreign ports as the master might direct, and return to a port of discharge in the United States; that they had each signed shipping articles to perform the duties of seamen during the course of the voyage; but, becoming dissatisfied with their employment, they left the vessel at Astoria, in the State of Oregon, and were subsequently arrested under the provisions of Rev. Stat. §§ 4596 to 4599, taken before a justice of the peace, and by him committed to jail until the Arago was ready for sea (some sixteen days), when they were taken from the jail by the marshal and placed on board the Arago against their will; that they refused to "turn to" in obedience to the orders of the master, were arrested at San Francisco, charged with refusing to work in violation of Rev. Stat. § 4596; were subsequently examined before a commissioner of the Circuit Court, and by him held to answer such charge before the District Court for the Northern District of California.

Shortly thereafter they sued out this writ of *habeas corpus*, which, upon a hearing before the District Court, was dismissed, and an order made remanding the prisoners to the custody of the marshal.

Whereupon petitioners appealed to this court.

*Mr. Jackson H. Ralston* for appellants. *Mr. James G. Maguire* and *Mr. H. W. Hutton* were with him on the brief.

*Mr. Solicitor General* for appellees.

Mr. JUSTICE BROWN delivered the opinion of the court.

Upon what ground the court below dismissed the writ, and remanded the petitioners, does not appear, but the record raises two questions of some importance. *First,* as to the constitutionality of Rev. Stat. §§ 4598 and 4599, in so far as they confer jurisdiction upon justices of the peace to apprehend deserting seamen, and return them to their vessel; *Second,* as to the conflict of the same sections and also § 4596 with the Thirteenth Amendment to the Constitution, abolishing slavery and involuntary servitude.

Section 4598, which was taken from § 7 of the act of July 20, 1790, c. 29, 1 Stat. 131, 134, reads as follows:

"SEC. 4598. If any seaman who shall have signed a contract to perform a voyage shall, at any port or place, desert, or shall absent himself from such vessel, without leave of the master, or officer commanding in the absence of the master, it shall be lawful for any justice of the peace within the United States, upon the complaint of the master, to issue his warrant to apprehend such deserter, and bring him before such justice; and if it then appears that he has signed a contract within the intent and meaning of this title, and that the voyage agreed for is not finished, or altered, or the contract otherwise dissolved, and that such seaman has deserted the vessel, or absented himself without leave, the justice shall commit him to the house of correction or common jail of the city, town or place, to remain there until the vessel shall be ready to proceed on her voyage, or till the master shall require his discharge, and then to be delivered to the master, he paying all the cost of such commitment, and deducting the same out of the wages due to such seaman."

Sec. 4599, which was taken from § 53 of the Shipping Commissioners' Act of June 7, 1872, c. 322, 17 Stat. 262, 274, authorizes the apprehension of deserting seamen, with or without the assistance of the local public officers or constables, and without a warrant, and their conveyance before any court of justice or magistrate of the State to be dealt with according to law.

Sec. 4596, which is also taken from the same act, provides punishment by imprisonment for desertion, refusal to join the vessel, or absence without leave.

1. The first proposition, that Congress has no authority under the Constitution to vest judicial power in the courts or judicial officers of the several States, originated in an observation of Mr. Justice Story in *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 330, to the effect that "Congress cannot vest any portion of the judicial power of the United States, except in courts ordained and established by itself." This was repeated in *Houston* v. *Moore*, 5 Wheat. 1, 27; and the same general doctrine has received the approval of the courts of several of the States. *United States* v. *Lathrop*, 17 Johns. 4; *Ely* v. *Peck*, 7 Connecticut, 239; *United States* v. *Campbell*, 6 Hall's Law Jour. 113 [Ohio Com. Pleas]. These were all actions for penalties, however, wherein the courts held to the familiar doctrine that the courts of one sovereignty will not enforce the penal laws of another. *Huntington* v. *Attrill*, 146 U. S. 657, 672. In *Commonwealth* v. *Feely*, 1 Va. Cases, 321, it was held by the General Court of Virginia in 1813 that the state courts could not take jurisdiction of an indictment for a crime committed against an act of Congress.

In *Ex parte Knowles*, 5 California, 300, it was also held that Congress had no power to confer jurisdiction upon the courts of a State to naturalize aliens, although, if such power be recognized by the legislature of a State, it may be exercised by the courts of such State of competent jurisdiction.

In *State* v. *Rutter*, 12 Niles' Register, 115, 231, it was held in 1817 by Judges Bland and Hanson of Maryland that Congress had no power to authorize justices of the peace to issue warrants for the apprehension of offenders against the laws of

the United States. A directly contrary view, however, was taken by Judge Cheves of South Carolina in *Ex parte Rhodes*, 12 Niles' Reg. 264.

The general principle announced by these cases is derived from the third article of the Constitution, the first section of which declares that " the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish," the judges of which courts " shall hold their offices during good behavior," etc.; and by the second section, " the judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their author- ity; to all cases affecting ambassadors, other public ministers and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more States; between a State and citizens of another State; between citizens of different States; between citizens of the same State claiming lands under grants of different States, and between a State or the citizens thereof, and foreign States, citizens or subjects."

The better opinion is that the second section was intended as a constitutional definition of the judicial power, *Chisholm* v. *Georgia*, 2 Dall. 419, 475, which the Constitution intended to confine to courts created by Congress; in other words, that such power extends only to the trial and determination of " cases " in courts of record, and that Congress is still at liberty to authorize the judicial officers of the several States to exercise such power as is ordinarily given to officers of courts not of record; such, for instance, as the power to take affidavits, to arrest and commit for trial offenders against the laws of the United States, to naturalize aliens, and to perform such other duties as may be regarded as incidental to the judi- cial power rather than a part of the judicial power itself. This was the view taken by the Supreme Court of Alabama in *Ex parte Gist*, 26 Alabama, 156, wherein the authority of justices of the peace and other such officers to arrest and com- mit for a violation of the criminal law of the United States

was held to be no part of the judicial power within the third article of the Constitution. And in the case of *Prigg* v. *Pennsylvania*, 16 Pet. 539, it was said that, as to the authority conferred on state magistrates to arrest fugitive slaves and deliver them to their owners, under the act of February 12, 1793, while a difference of opinion existed, and might still exist upon this point in different states, whether state magistrates were bound to act under it, no doubt was entertained by this court that state magistrates might, if they chose, exercise the authority, unless prohibited by state legislation. See also *Moore* v. *Illinois*, 14 How. 13 ; *In re Kaine*, 14 How. 103.

We think the power of justices of the peace to arrest deserting seamen and deliver them on board their vessel is not within the definition of the "judicial power" as defined by the Constitution, and may be lawfully conferred upon state officers. That the authority is a most convenient one to entrust to such officers cannot be denied, as seamen frequently leave their vessels in small places, where there are no Federal judicial officers, and where a justice of the peace may usually be found, with authority to issue warrants under the state laws.

2. The question whether sections 4598 and 4599 conflict with the Thirteenth Amendment, forbidding slavery and involuntary servitude, depends upon the construction to be given to the term "involuntary servitude." Does the epithet "involuntary" attach to the word "servitude" continuously, and make illegal any service which becomes involuntary at any time during its existence; or does it attach only at the inception of the servitude, and characterize it as unlawful because unlawfully entered into? If the former be the true construction, then no one, not even a soldier, sailor or apprentice, can surrender his liberty, even for a day ; and the soldier may desert his regiment upon the eve of battle, or the sailor abandon his ship at any intermediate port or landing, or even in a storm at sea, provided only he can find means of escaping to another vessel. If the latter, then an individual may, for a valuable consideration, contract for the surrender of his personal liberty for a definite time and for a recognized purpose, and subordinate his going and coming to the will of

another during the continuance of the contract; — not that all such contracts would be lawful, but that a servitude which was knowingly and willingly entered into could not be termed involuntary. Thus, if one should agree, for a yearly wage, to serve another in a particular capacity during his life, and never to leave his estate without his consent, the contract might not be enforceable for the want of a legal remedy, or might be void upon grounds of public policy, but the servitude could not be properly termed involuntary. Such agreements for a limited personal servitude at one time were very common in England, and by statute of June 17, 1823, 4 Geo. IV, c. 34, § 3, it was enacted that if any servant in husbandry, or any artificer, calico printer, handicraftsman, miner, collier, keelman, pitman, glassman, potter, laborer or other person, should contract to serve another for a definite time, and should desert such service during the term of the contract, he was made liable to a criminal punishment. The breach of a contract for personal service has not, however, been recognized in this country as involving a liability to criminal punishment, except in the cases of soldiers, sailors and possibly some others, nor would public opinion tolerate a statute to that effect.

But we are also of opinion that, even if the contract of a seaman could be considered within the letter of the Thirteenth Amendment, it is not, within its spirit, a case of involuntary servitude. The law is perfectly well settled that the first ten amendments to the Constitution, commonly known as the Bill of Rights, were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions arising from the necessities of the case. In incorporating these principles into the fundamental law there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed. Thus, the freedom of speech and of the press (art. 1) does not permit the publication of libels, blasphemous or indecent articles, or other publications injurious to public morals or private reputation; the right of the people

to keep and bear arms (art. 2) is not infringed by laws pro-
hibiting the carrying of concealed weapons; the provision
that no person shall be twice put in jeopardy (art. 5) does not
prevent a second trial, if upon the first trial the jury failed to
agree, or if the verdict was set aside upon the defendant's
motion, *United States* v. *Ball*, 163 U. S. 662, 672; nor does
the provision of the same article that no one shall be a witness
against himself impair his obligation to testify, if a prosecu-
tion against him be barred by the lapse of time, a pardon or by
statutory enactment. *Brown* v. *Walker*, 161 U. S. 591, and
cases cited. Nor does the provision that an accused person
shall be confronted with the witnesses against him prevent
the admission of dying declarations, or the depositions of
witnesses who have died since the former trial.

The prohibition of slavery, in the Thirteenth Amendment,
is well known to have been adopted with reference to a state
of affairs which had existed in certain States of the Union
since the foundation of the government, while the addition of
the words "involuntary servitude" were said in the *Slaughter-
house cases*, 16 Wall. 36, to have been intended to cover the
system of Mexican peonage and the Chinese coolie trade, the
practical operation of which might have been a revival of
the institution of slavery under a different and less offensive
name. It is clear, however, that the amendment was not
intended to introduce any novel doctrine with respect to cer-
tain descriptions of service which have always been treated
as exceptional; such as military and naval enlistments, or to
disturb the right of parents and guardians to the custody of
their minor children or wards. The amendment, however,
makes no distinction between a public and a private service.
To say that persons engaged in a public service are not within
the amendment is to admit that there are exceptions to its
general language, and the further question is at once pre-
sented, where shall the line be drawn? We know of no better
answer to make than to say that services which have from time
immemorial been treated as exceptional shall not be regarded
as within its purview.

From the earliest historical period the contract of the sailor

has been treated as an exceptional one, and involving, to a certain extent, the surrender of his personal liberty during the life of the contract. Indeed, the business of navigation could scarcely be carried on without some guaranty, beyond the ordinary civil remedies upon contract, that the sailor will not desert the ship at a critical moment, or leave her at some place where seamen are impossible to be obtained — as Molloy forcibly expresses it, "to rot in her neglected brine." Such desertion might involve a long delay of the vessel while the master is seeking another crew, an abandonment of the voyage, and, in some cases, the safety of the ship itself. Hence, the laws of nearly all maritime nations have made provision for securing the personal attendance of the crew on board, and for their criminal punishment for desertion, or absence without leave during the life of the shipping articles.

Even by the maritime law of the ancient Rhodians, which is supposed to antedate the birth of Christ by about 900 years, according to Pardessus, (Lois Maritimes, vol. 1, page 250,) if the master or the sailors absented themselves by night, and the vessel were lost or damaged, they were bound to respond in the amount of the loss.

In the compilation of maritime laws, known as the Consulate of the Sea, it was also provided that a sailor should not go ashore without permission, upon the penalty of being obliged to pay any damage occasioned by his absence, and, in default of his being able to respond, of being thrust in prison until he had paid all such damage. Chapters 121, 124; 2 Pardessus, 146, 147, 148.

A like provision is found in the Rules of Oleron, promulgated in the reign of Henry III, by which, Art. V, the seamen were forbidden to leave the ship without the master's consent. "If they do and by that means she happens to be lost or damnified, they shall be answerable for the damage." 1 Pet. Ad'my, xi. A similar prohibition is found in article seventeen of the laws of Wisbuy. 1 Pet. Ad. lxxiii.

The laws of the towns belonging to the Hanseatic League, first enacted and promulgated in 1597, were still more explicit and severe. No seaman might go ashore without the consent

of the master or other officer, and if he remained longer than the time allowed, was condemned to pay a fine or suffer an imprisonment (Arts. 22 and 23); and by article forty if a seaman went ashore without leave, and the ship happened to receive any damage, "he shall be kept in prison upon bread and water for one year," and if any seaman died or perished for the want of the assistance of the absent seaman, the latter was subject to corporal punishment; and, by article forty-three, "if an officer or seaman quits a ship and conceals himself; if afterwards he is apprehended, he shall be delivered up to justice to be punished; he shall be stigmatized in the face with the first letter of the name of the town to which he belongs." 1 Pet. Ad. cii.

By the Marine Ordinance of Louis XIV, which was in existence at the time the Constitution was adopted (Title Third, Art. III), "if a seaman leaves a master without a discharge in writing before the voyage is begun, he may be taken up and imprisoned wherever he can be found, and compelled to restore what he has received, and serve out the time for which he had engaged himself for nothing; and if he leaves the ship after the voyage is begun, he may be punished corporally." Art. V: "After the ship is laded, the seamen shall not go ashore without leave from the master; under pain of five livres for the first fault; and may be punished corporally if they commit a second."

The present commercial code of France, however, makes no express provision upon the subject; but by the general mercantile law of Germany, Art. 532, "the master can cause any seaman, who, after having been engaged, neglects to enter upon or continue to do his duties, to be forcibly compelled to perform the same."

By the Dutch code, Art. 402, "the master, or his representative, can call in the public force against those who refuse to come on board, who absent themselves from the ship without leave, and refuse to perform to the end of the service for which they were engaged."

Nearly all of the ancient commercial codes either make provision for payment of damages by seamen who absent

themselves from their ships without leave, or for their imprisonment, or forcible conveyance on board. Some of the modern commercial codes of Europe and South America make similar provisions. (Argentine Code, Art. 1154.) Others, including the French and Spanish codes, are silent upon the subject.

Turning now to the country from which we have inherited most immediately our maritime laws and customs, we find that Malynes, the earliest English writer upon the Law Merchant, who wrote in 1622, says in his *Lex Mercatoria* (vol. I, chap. 23), that "mariners in a strange port, should not leave the ship without the master's license, or fastening her with four ropes, or else the loss falls upon them. . . . In a strange country, the one half of the company, at least, ought to remain on shipboard, and the rest who go on land should keep sobriety and abstain from suspected places, or else should be punished in body and purse; like as he who absents himself when the ship is ready to sail. Yea, if he give out himself worthier than he is in his calling, he shall lose his hire; half to the admiral, and the other half to the master." Molloy, one of the most satisfactory of early English writers upon the subject, states that if seamen depart from a ship without leave or license of the master, and any disaster happens, they must answer, quoting Art. V of the Rules of Oleron in support of his proposition.

There appears to have been no legislation directly upon the subject until 1729, when the act of 2 Geo. II, c. 36, was enacted "for the better regulation and government of seamen in the merchants' service." This act not only provided for the forfeiture of wages in case of desertion, but for the apprehension of seamen deserting or absenting themselves, upon warrants to be issued by justices of the peace, and, in case of their refusal, to proceed upon the voyage, for their committal to the house of correction at hard labor. Indeed, this seems to have furnished a model upon which the act of Congress of July 20, 1790 (1 Stat. 131), for the government and regulation of seamen in the merchants' service, was constructed. The provisions of this act were substantially repeated by the

act of 1791 (31 Geo. III, c. 39), and were·subsequently added
to and amended by acts of·5 &·6 Wm. IV, c. 19, and 7 & 8
Victoria, c. 112.

The modern law of England is full and explicit upon the
duties and responsibilities of seamen.   By the Merchants' Ship-
ping Act of 1854, 17 & 18 Victoria, c. 104, section 243, a
seaman guilty of desertion might be summarily punished by
imprisonment, by forfeiture of his clothes and effects, and all
or any part of his wages.   Similar punishment was meted out
to him for neglecting or refusing to join his ship, or to proceed
to sea, or for absence without leave at any time.   By section
246, " whenever, either at the commencement or during the
progress of any voyage, any seaman or apprentice neglects, or
refuses to join, or deserts from or refuses to proceed to sea in
any ship in which he is duly engaged to serve," the master
was authorized to call upon the police officers or constables to
apprehend him without warrant and take him before a magis-
trate who, by article 247, was authorized to order him to be
conveyed on board for the purpose of proceeding on the
voyage.

The provision for imprisonment for desertion seems to have
been repealed by the Merchants' Seamen (Payment of Wages
and Rating) Act of 1880, 43 & 44 Vict. c. 16; but the tenth
section of that act retained the provision authorizing the mas-
ter to call upon the police officers or constables to convey
deserting seamen on board their vessels.

This act, however, appears to have been found too lenient,
since, in 1894, the whole subject was reconsidered and covered
in the new Merchants'· Shipping Act, 57 & 58 Vict. c. 60, of
748 sections, section 221 of which provides not only for the
forfeiture of wages in case of desertion, but for imprisonment
with or without hard labor, except in cases arising in the
United Kingdom.   The provision for the arrest of the desert-
ing seaman, and his conveyance on board the ship, is, how-
ever, retained both within and without the kingdom.   §§ 222,
223.   This is believed to be the latest legislation on the sub-
ject in England.

The earliest American legislation, which we have been able

to find, is an act of the Colonial General Court of Massachu-. setts, passed about 1668, wherein it was enacted that any mariner who departs and leaves a voyage upon which he has entered, shall forfeit all his wages, and shall be further punished by imprisonment or otherwise, as the case may be circumstanced; and if he shall have received any considerable part of his wages, and shall run away, he shall be pursued as a disobedient runaway servant. Mass. Col. Laws, (ed. 1889) 251, 256.

The provision of Rev. Stat. § 4598, under which these proceedings were taken, was first enacted by Congress in 1790. 1 Stat. 131, § 7. This act provided for the apprehension of deserters and their delivery on board the vessel, but apparently made no provision for imprisonment as a punishment for desertion; but by the Shipping Commissioners' Act of 1872, c. 322, 17 Stat. 243, 273, § 51, now incorporated into the Revised Statutes as section 4596, the court is authorized to add to forfeiture of wages for desertion imprisonment for a period of not more than three months, and for absence without leave imprisonment for not more than one month. In this act and the amendments thereto very careful provisions are made for the protection of seamen against the frauds and cruelty of masters, the devices of boarding-house keepers, and, as far as possible, against the consequences of their own ignorance and improvidence. At the same time discipline is more stringently enforced by additional punishments for desertion, absence without leave, disobedience, insubordination and barratry. Indeed, seamen are treated by Congress, as well as by the Parliament of Great Britain, as deficient in that full and intelligent responsibility for their acts which is accredited to ordinary adults, and as needing the protection of the law in the same sense which minors and wards are entitled to the protection of their parents and guardians: "*quemadmodum pater in filios, magister in discipulos, dominus in servos vel familiares.*" The ancient characterization of seamen as "wards of admiralty" is even more accurate now than it was formerly.

In the face of this legislation upon the subject of desertion and absence without leave, which was in force in this country

for more than sixty years before the Thirteenth Amendment was adopted, and similar legislation abroad from time immemorial, it cannot be open to doubt that the provision against involuntary servitude was never intended to apply to their contracts.

The judgment of the court below is, therefore,

*Affirmed.*

Mr. Justice Harlan dissenting.

The appellants shipped on the American barkantine Arago, having previously signed articles whereby they undertook to perform the duties of seamen during a voyage of that vessel from San Francisco (quoting from the record) "to Knappton, State of Washington, and thence to Valparaiso, and thence to such other foreign ports as the master may direct, and return to a port of discharge in the United States." The vessel was engaged in a purely private business.

As stated in the opinion of the court, the appellants left the vessel at Astoria, Oregon, without the consent of the master, having become dissatisfied with their employment. The grounds of such dissatisfaction are not stated.

Upon the application of the master, a justice of the peace at Astoria, Oregon, proceeding under sections 4596 to 4599 of the Revised Statutes of the United States, issued a warrant for the arrest of the appellants. They were seized, somewhat as runaway slaves were in the days of slavery, and committed to jail without bail, "until the Arago was ready for sea." After remaining in jail some sixteen days, they were taken by the marshal and placed on board the Arago against their will. While on board they refused to "turn to" or to work in obedience to the orders of the master. Upon the arrival of the barkantine at San Francisco they were arrested for having refused to work on the vessel, and committed for trial upon that charge.

If the placing of the appellants on board the Arago at Astoria against their will was illegal, then their refusal to work while thus forcibly held on the vessel could not be a criminal offence, and their detention and subsequent arrest

for refusing to work while the vessel was going from Astoria to San Francisco were without authority of law. The question therefore is, whether the appellants, having left the vessel at Astoria, no matter for what cause, could lawfully be required against their will to return to it, and to render personal services for the master.

The government justifies the proceedings taken against the appellants at Astoria by sections 4596, 4598 and 4599 of the Revised Statutes of the United States.

By section 4596 it is provided :

"Sec. 4596. Whenever any seaman who has been lawfully engaged, or any apprentice to the sea service, commits any of the following offences, he shall be punishable as follows : First. For desertion, by imprisonment for not more than three months, and by forfeiture of all or any part of the clothes or effects he leaves on board, and of all or any part of the wages or emoluments which he has then earned. Second. For neglecting and refusing, without reasonable cause, to join his vessel, or to proceed to sea in his vessel, or for absence without leave at any time within twenty-four hours of the vessel sailing from any port, either at the commencement or during the progress of any voyage; or for absence at any time without leave, and without sufficient reason, from his vessel, or from his duty, not amounting to desertion, or not treated as such by the master; by imprisonment for not more than one month, and also, at the discretion of the court, by forfeiture of his wages, of not more than two days' pay, and, for every twenty-four hours of absence, either a sum not exceeding six days' pay, or any expenses which have been properly incurred in hiring a substitute. Third. For quitting the vessel without leave after her arrival at her port of delivery, and before she is placed in security, by forfeiture out of his wages of not more than one month's pay. Fourth. For wilful disobedience to any lawful command, by imprisonment for not more than two months, and also, at the discretion of the court, by forfeiture out of his wages of not more than four days' pay. Fifth. For continued wilful disobedience to lawful commands. or continued wilful neglect of duty, by im-

prisonment for not more than six months, and also, at the discretion of the court, by forfeiture, for every twenty-four hours' continuance of such disobedience or neglect, of either a sum not more than twelve days' pay, or sufficient to defray any expenses which have been properly incurred in hiring a substitute. Sixth. For assaulting any master or mate, by imprisonment for not more than two years. Seventh. For combining with any others of the crew to disobey lawful commands, or to neglect duty, or to impede navigation of the vessel, or the progress of the voyage, by imprisonment for not more than twelve months. . . ."

These provisions are brought forward from the act of June 7, 1872, c. 322, § 51. 17 Stat. 273.

Section 4598 provides:

" SEC. 4598. If any seaman who shall have signed a contract to perform a voyage shall, at any port or place, desert, or shall absent himself from such vessel, without leave of the master, or officer commanding in the absence of the master, it shall be lawful for any justice of the peace within the United States, upon the complaint of the master, to issue his warrant to apprehend such deserter, and bring him before such justice; and if it then appears that he has signed a contract within the intent and meaning of this title, and that the voyage agreed for is not finished, or altered, or the contract otherwise dissolved, and that such seaman has deserted the vessel, or absented himself without leave, the justice shall commit him to the house of correction or common jail of the city, town or place, to remain there until the vessel shall be ready to proceed on her voyage, or till the master shall require his discharge, and then to be delivered to the master, he paying all the cost of such commitment, and deducting the same out of the wages due to such seaman."

This section is the same as section 7 of the act of July 20, 1790, c. 29. 1 Stat. 134.

By section 4599 — which is substantially the same as section 53 of the above act of June 7, 1872 — it is provided :

" SEC. 4599. Whenever, either at the commencement of or during any voyage, any seaman or apprentice neglects or re-

fuses to join, or deserts from or refuses to proceed to sea in, any vessel in which he is duly engaged to serve, or is found otherwise absenting himself therefrom without leave, the master or any mate, or the owner or consignee, or shipping commissioner, may, in any place in the United States, with or without the assistance of the local public officers or constables, who are hereby directed to give their assistance if required, and also at any place out of the United States, if and so far as the laws in force at such place will permit, apprehend him without first procuring a warrant; and may thereupon, in any case, and shall in case he so requires and it is practicable, convey him before any court of justice or magistrate of any State, city, town or county, within the United States, authorized to take cognizance of offences of like degree and kind, to be dealt with according to the provisions of law governing such cases; and may, for the purpose of conveying him before such court or magistrate, detain him in custody for a period not exceeding twenty-four hours, or may, if he does not so require, or if there is no such court at or near the place, at once convey him on board. If such apprehension appears to the court or magistrate before whom the case is brought to have been made on improper or on insufficient grounds, the master, mate, consignee or shipping commissioner who makes the same, or causes the same to be made, shall be liable to a penalty of not more than one hundred dollars; but such penalty, if inflicted, shall be a bar to any action for false imprisonment."

The decision just made proceeds upon the broad ground that one who voluntarily engages to serve upon a private vessel in the capacity of a seaman for a given term, but who, without the consent of the master, leaves the vessel when in port before the stipulated term is ended and refuses to return to it, may be arrested and held in custody until the vessel is ready to proceed on its voyage, and then delivered against his will, and if need be by actual force, on the vessel to the master.

The Thirteenth Amendment of the Constitution of the United States declares that "neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party

shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

Slavery exists wherever the law recognizes a right of property in a human being; but slavery cannot exist in any form within the United States. The Thirteenth Amendment uprooted slavery as it once existed in this country, and destroyed all of its badges and incidents. It established freedom for all. "By its own unaided force and effect it abolished slavery and established freedom." The amendment, this court has also said, "is not a mere prohibition of state laws establishing or upholding slavery or involuntary servitude, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *Civil Rights cases*, 109 U. S. 3; 20.

As to involuntary servitude, it may exist in the United States; but it can only exist lawfully as a punishment for crime of which the party shall have been duly convicted. Such is the plain reading of the Constitution. A condition of enforced service, even for a limited period, in the private business of another, is a condition of involuntary servitude.

If it be said that government may make it a criminal offence, punishable by fine or imprisonment or both, for any one to violate his private contract voluntarily made, or to refuse without sufficient reason to perform it — a proposition which cannot, I think, be sustained at this day, in this land of freedom — it would by no means follow that government could, by force applied in advance of due conviction of some crime, compel a freeman to render personal services in respect of the private business of another. The placing of a person, by force, on a vessel about to sail, is putting him in a condition of involuntary servitude, if the purpose is to compel him against his will to give his personal services in the private business in which that vessel is engaged. The personal liberty of individuals, it has been well said, "consists in the power of locomotion, of changing situation, or moving one's person to whatsoever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law." 1 Bl. c. 1, p. 134.

Can the decision of the court be sustained under the clause of the Constitution granting power to Congress to regulate commerce with foreign nations and among the several States? That power cannot be exerted except with due regard to other provisions of the Constitution, particularly those embodying the fundamental guarantees of life, liberty and property. While Congress may enact regulations for the conduct of commerce with foreign nations and among the States, and may, perhaps, prescribe punishment for the violation of such regulations, it may not, in so doing, ignore other clauses of the Constitution. For instance, a regulation of commerce cannot be sustained which, in disregard of the express injunctions of the Constitution, imposes a cruel and unusual punishment for its violation, or compels a person to testify in a criminal case against himself, or authorizes him to be put twice in jeopardy of life or limb, or denies to the accused the privilege of being confronted with the witnesses against him, or of being informed of the nature and cause of the accusation against him. And it is equally clear that no regulation of commerce established by Congress can stand if its necessary operation be either to establish slavery, or to create a condition of involuntary servitude forbidden by the Constitution.

It is said that the statute in question is sanctioned by long usage among the nations of the earth, as well as by the above act of July 20, 1790.

In considering the antiquity of regulations that restrain the personal freedom of seamen, the court refers to the laws of the ancient Rhodians, which are supposed to have antedated the Christian era. But those laws, whatever they may have been, were enacted at a time when no account was taken of man as man, when human life and human liberty were regarded as of little value, and when the powers of government were employed to gratify the ambition and the pleasures of despotic rulers rather than promote the welfare of the people.

Attention has been called by the court to the laws enacted by the towns of the Hanseatic League four hundred years ago, by one of which a seaman who went ashore without leave could, in certain contingencies, be kept in prison " upon bread

and water for one year," and by another of which an officer or seaman who quit his ship and concealed himself could be apprehended and " stigmatized in the face with the first letter of the name of the town to which he belongs." Why the reference to these enactments of ancient times, enforced by or under governments possessing arbitrary power inconsistent with a state of freedom? Does any one suppose that a regulation of commerce authorizing seamen who quit their ship, without leave, to be imprisoned "upon bread and water for one year," or which required them to be "stigmatized in the face" with the letter of the town or State to which they belonged, would now receive the sanction of any court in the United States?

Reference has also been made to an act of the Colonial General Court of Massachusetts, passed in 1668, declaring that a seaman who left his vessel before its voyage was ended might be "pursued as a runaway servant." But the act referred to was passed when slavery was tolerated in Massachusetts with the assent of the government of Great Britain. It antedated the famous Declaration of Rights, promulgated in 1780, in which Massachusetts declared, among other things, that "all men are born free and equal, and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness."

The effect of that Declaration was well illustrated in *Parsons* v. *Trask*, 7 Gray, 473, 478. That case involved the validity of a contract made in a foreign country in 1840 by an adult inhabitant thereof with a citizen of the United States, " to serve him, his executors and assigns" for the term of five years, " during all of which term the said servant her said master, his executors or assigns, faithfully shall serve, and that honestly and obediently in all things, as a good and dutiful servant ought to do." It was sought to enforce this contract in Massachusetts. After carefully examining the provisions of the contract, the court said: "As to the nature, then, of the service to be performed, the place where and the person

to whom it is to be rendered, and the compensation to be paid, the contract is uncertain and indefinite; indefinite and uncertain, not from any infirmity in the language of the parties, but in its substance and intent. It is, in substance and effect, a contract for servitude, with no limitation but that of time; leaving the master to determine what the service should be, and the place where and the person to whom it should be rendered. Such a contract, it is scarcely necessary to say, is against the policy of our institutions and laws. If such a sale of service could be lawfully made for five years, it might, from the same reasons, for ten, and so for the term of one's life. The door would thus be opened for a species of servitude inconsistent with the first and fundamental article of our Declaration of Rights, which, *proprio vigore*, not only abolished every vestige of slavery then existing in the Commonwealth, but rendered every form of it thereafter legally impossible. That article has always been regarded not simply as the declaration of an abstract principle, but as having the active force and conclusive authority of law." Observing that one who voluntarily subjected himself to the laws of the State must find in them the rule of restraint as well as the rule of action, the court proceeded: "Under this contract the plaintiff had no claim for the labor of the servant for the term of five years, or for any term whatever. She was under no legal obligation to remain in his service. There was no time during which her service was due to the plaintiff, and during which she was kept from such service by the acts of the defendants."

It may be here remarked that the shipping articles signed by the appellants left the term of their service uncertain, and placed no restriction whatever upon the route of the vessel after it left Valparaiso, except that it should ultimately return to some port in the United States. Under the contract of service, it was at the volition of the master to entail service upon these appellants for an indefinite period. So far as the record discloses, it was an accident that the vessel came back to San Francisco when it did. By the shipping articles, the appellants could not quit the vessel until it returned to a port of the

United States, and such return depended absolutely upon the will of the master. He had only to land at foreign ports, and keep the vessel away from the United States, in order to prevent the appellants from leaving his service.

Nor, I submit, is any light thrown upon the present question by the history of legislation in Great Britain about seamen. The powers of the British Parliament furnish no test for the powers that may be exercised by the Congress of the United States. Referring to the difficulties confronting the convention of 1,787 which framed the present Constitution of the United States, and to the profound differences between the instrument framed by it and what is called the British Constitution, Mr. Bryce, an English writer of high authority, says in his admirable work on the American Commonwealth: "The British Parliament had always been, was then, and remains now, a sovereign and constituent assembly. It can make and unmake any and every law, change the form of government or the succession to the crown, interfere with the course of justice, extinguish the most sacred private rights of the citizen. Between it and the people at large there is no legal distinction, because the whole plenitude of the people's rights and powers resides in it, just as if the whole nation were present within the chamber where it sits. In point of legal theory it is the nation, being the historical successor of the Folk Moot of our Teutonic forefathers. Both practically and legally, it is to-day the only and the sufficient depository of the authority of the nation; and is, therefore, within the sphere of law, irresponsible and omnipotent." Vol. 1, p. 32. No such powers have been given to or can be exercised by any legislative body organized under the American system. Absolute, arbitrary power exists nowhere in this free land. The authority for the exercise of power by the Congress of the United States must be found in the Constitution. Whatever it does in excess of the powers granted to it, or in violation of the injunctions of the supreme law of the land, is a nullity, and may be so treated by every person. It would seem, therefore, evident that no aid in the present discussion can be derived from the legislation of Great Britain touching the rights, duties and

responsibilities of seamen employed on British vessels.  If the
Parliament of Great Britain, Her Britannic Majesty assenting,
should establish slavery or involuntary servitude in England,
the courts there would not question its authority to do so,
and would have no alternative except to sustain legislation of
that character.  A very short act of Parliament would suffice
to destroy all the guarantees of life, liberty and property now
enjoyed by Englishmen.  " What," Mr. Bryce says, " are called
in England constitutional statutes, such as Magna Charta, the
Bill of Rights, the Act of Settlement, the Acts of Union with
Scotland and Ireland, are merely ordinary laws, which could
be repealed by Parliament at any moment in exactly the
same way as it can repeal a highway act or lower the duty on
tobacco."  Parliament, he further says, " can abolish when it
pleases any institution of the country, the Crown, the House
of Lords, the Established Church, the House of Commons,
Parliament itself."  Vol. 1, pp. 237, 238.  In this country, the
will of the people as expressed in the fundamental law must
be the will of courts and legislatures.  No court is bound to
enforce, nor is any one legally bound to obey, an act of Con-
gress inconsistent with the Constitution.  If the Thirteenth
Amendment forbids such legislation in reference to seamen as
is now under consideration, that is an end of the matter, and
it is of no consequence whatever that government in other
countries may by the application of force, or by the infliction
of fines and imprisonment, compel seamen to continue in the
personal service of those whom they may have agreed to serve
in private business.

Is the existing statute to be sustained because its essential
provisions were embodied in the act of 1790?  I think not,
and for the reason, if there were no other, that the Thirteenth
Amendment imposes restrictions upon the powers of Congress
that did not exist when that act was passed.  The supreme
law of the land now declares that involuntary servitude, ex-
cept as a punishment for crime of which the party shall have
been duly convicted, shall not exist anywhere within the
United States.

The only exceptions to the general principles I have referred

to, so far as they relate to private business, arise out of statutes respecting apprentices of tender years.  But statutes relating to that class rest largely upon the idea that a minor is incapable of having an absolute will of his own before reaching majority.  The infant apprentice, having no will in the matter, is to be cared for and protected in such way as, in the judgment of the State, will best subserve the interests both of himself and of the public.  An apprentice serving his master pursuant to terms permitted by the law cannot, in any proper sense, be said to be in a condition of involuntary servitude. Upon arriving at his majority, the infant apprentice may repudiate the contract of apprenticeship, if it extends beyond that period.  2. Parsons on Contr. 50.  The word "involuntary" refers, primarily, to persons entitled, in virtue of their age, to act upon their independent judgment when disposing of their time and labor.  Will any one say that a person, who has reached his majority, and who had voluntarily agreed, for a valuable consideration, to serve another as an apprentice for an indefinite period, or even for a given number of years, can be compelled, against his will, to remain in the service of the master?

It is said that the grounds upon which the legislation in question rests are the same as those existing in the cases of soldiers and sailors.  Not so.  The Army and Navy of the United States are engaged in the performance of public, not private, duties.  Service in the army or navy of one's country according to the terms of enlistment never implies slavery or involuntary servitude, even where the soldier or sailor is required against his will to respect the terms upon which he voluntarily engaged to serve the public.  Involuntary service rendered for the public, pursuant as well to the requirements of a statute as to a previous voluntary engagement, is not, in any legal sense, either slavery or involuntary servitude.

The further suggestion is made that seamen have always been treated by legislation in this country and in England as if they needed the protection of the law in the same sense that minors and wards need the protection of parents and guardians, and hence have been often described as "wards of admiralty."

Some writers say that seamen are in need of the protection of the courts, " because peculiarly exposed to the wiles of sharpers and unable to take care of themselves." 2 Parsons Shipp. & Adm. 32. Mr. Justice Story in *Harden* v. *Gordon*, 2 Mason, 541, 555, said that "every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying, and are easily overreached." Mr. Justice Thompson, in the *Brig Cadmus* v. *Matthews*, 2 Paine, 229, 240, said: "In considering the obligation of seamen, arising out of their contract in their shipping articles, according to the formula in common use, due weight ought to be given to the character and situation of this class of men. Generally ignorant and improvident, and probably very often signing the shipping articles without knowing what they contain, it is the duty of a court to watch over and protect their rights, and apply very liberal and equitable considerations to the enforcement of their contracts."

In view of these principles, I am unable to understand how the necessity for the *protection* of seamen against those who take advantage of them can be made the basis of legislation compelling them, against their will, and by force, to render personal service for others engaged in private business. Their supposed helpless condition is thus made the excuse for imposing upon them burdens that could not be imposed upon other classes without depriving them of rights that inhere in personal freedom. The Constitution furnishes no authority for any such distinction between classes of persons in this country. If prior to the adoption of the Thirteenth Amendment the arrest of a seaman and his forcible return under any circumstances to the vessel on which he had engaged to serve could have been authorized by an act of Congress, such deprivation of the liberty of a freeman cannot be justified under the Constitution as it now is. To give any other construction to the Constitution is to say that it is not made for all, and that all men in this land are not free and equal before the law, but that one class may be so far subjected to involuntary servitude

as to be compelled by force to render personal services in a purely private business with which the public has no concern whatever.

The court holds that within the meaning of the Constitution the word "involuntary" does not attach to the word "servitude" continuously and make illegal a service which was voluntary at the outset, but became involuntary before the agreed term of service was ended; consequently, "an individual may, for a valuable consideration, contract for the surrender of his personal liberty for a definite time and for a recognized purpose, and subordinate his going and coming to the will of another during the continuance of the contract; not that all such contracts would be lawful, but that a servitude which was knowingly and willingly entered into could not be termed involuntary. Thus," the court proceeds, "if one should agree, for a yearly wage, to serve another in a particular capacity during his life, and never to leave his estate without his consent, the contract might be void upon grounds of public policy, but the servitude could not be properly termed involuntary. Such agreements for a limited personal servitude at one time were very common in England, and by statute of June 17, 1823, 4 Geo. IV, c. 34, it was enacted that if any servant in husbandry, or any artificer, calico printer, handicraftsman, miner, collier, keelman, pitman, glassman, potter, laborer or other person, should contract to serve another for a definite time, and should desert such service during the term of the contract, he was made liable to a criminal punishment. The breach of a contract for a personal service has not, however, been recognized in this country as involving a liability to criminal punishment, except in the cases of soldiers, sailors and apprentices, and possibly some others, nor would public opinion tolerate a statute to that effect."

It seems to me that these observations rest upon an erroneous view of the constitutional inhibition upon involuntary servitude.

Of the meaning and scope of the constitutional interdict upon slavery, no one can entertain doubt. A contract by which one person agrees to become the slave of another

would not be respected in any court, nor could it become the foundation of any claim or right, even if it were entered into without constraint being used upon the person who assumed to surrender his liberty and to become the property of another. But involuntary servitude, no matter when it arises, if it be not the result of punishment for crime of which the party has been duly convicted, is as much forbidden by the Constitution as is slavery. If that condition exists at the time the authority of the law is invoked to protect one against being forcibly compelled to render personal services for another, the court cannot refuse to act because the party seeking relief had voluntarily agreed to render such services during a given period. The voluntary contracts of individuals for personal services in private business cannot justify the existence anywhere or at any time in this country of a condition of involuntary servitude not imposed as a punishment for crime, any more than contracts creating the relation of master and slave can justify the existence and recognition of a state of slavery anywhere, or with respect to any persons, within the jurisdiction of the United States. The condition of one who contracts to render personal services in connection with the private business of another becomes a condition of involuntary servitude *from the moment he is compelled against his will* to continue in such service. He may be liable in damages for the non-performance of his agreement, but to require him, against his will, to continue in the personal service of his master is to place him and keep him in a condition of involuntary servitude. It will not do to say that by "immemorial usage" seamen could be held in a condition of involuntary servitude, without having been convicted of crime. The people of the United States, by an amendment of their fundamental law, have solemnly decreed that "except as a punishment for crime, whereof the party shall have been duly convicted," involuntary servitude shall not exist in any form in this country. The adding another exception by interpretation simply, and without amending the Constitution, is, I submit, judicial legislation. It is a very serious matter when a judicial tribunal, by the construction of an act of Congress, defeats the expressed will of the

OCTOBER TERM, 1896.

legislative branch of the government. It is a still more serious matter when the clear reading of a constitutioffal provision relating to the liberty of man is departed from in deference to what is called usage which has existed, for the most part, under monarchical and despotic governments.

In considering this case it is our duty to look at the consequences of any decision that may be rendered. We cannot avoid this duty by saying that it will be time enough to consider supposed cases when they arise. When such supposed cases do arise, those who seek judicial support for extraordinary remedies that encroach upon the liberty of freemen will of course refer to the principles announced in previous adjudications, and demand their application to the particular case in hand.

It is, therefore, entirely appropriate to inquire as to the necessary results of the sanction given by this court to the statute here in question. If Congress, under its power to regulate commerce with foreign nations and among the several States, can. authorize the arrest of a seaman who engaged to serve upon a private vessel, and compel him by force to return to the vessel and remain during the term for which he engaged, a similar rule may be prescribed as to employés upon railroads and steamboats engaged in commerce among the States. Even if it were conceded — a concession to be made only for argument's sake — that it could be made a criminal offence, punishable by fine or imprisonment or both, for such employés to quit their employment before the expiration of the term for which they agreed to serve, it would not follow that they could be compelled, against their will and in advance of trial and conviction, to continue in such service. But the decision to-day logically leads to the conclusion that such a power exists in Congress. Again, as the legislatures of the States have all legislative power not prohibited to them, while Congress can only exercise certain enumerated powers for accomplishing specified objects, why may not the States, under the principles this day announced, compel all employés of railroads engaged in domestic commerce, and all domestic servants, and all employés in private establishments, within

their respective limits, to remain with their employers during the terms for which they were severally engaged, under the penalty of being arrested by some sheriff or constable, and forcibly returned to the service of their employers? The mere statement of these matters is sufficient to indicate the scope of the decision this day rendered.

The Thirteenth Amendment, although tolerating involuntary servitude only when imposed as a punishment for crime of which the party shall have been duly convicted, has been construed, by the decision just rendered, as if it contained an additional clause expressly excepting from its operation seamen who engage to serve on private vessels. Under this view of the Constitution, we may now look for advertisements, not for runaway servants as in the days of slavery, but for runaway seamen. In former days, overseers could stand with whip in hand over slaves, and force them to perform personal service for their masters. While, with the assent of all, that condition of things has ceased to exist, we can but be reminded of the past when it is adjudged to be consistent with the law of the land for freemen who happen to be seamen to be held in custody that they may be forced to go aboard private vessels and render personal services against their will.

In my judgment the holding of any person in custody, whether in jail or by an officer of the law, against his will, for the purpose of compelling him to render personal service to another in a private business, places the person so held in custody in a condition of involuntary servitude forbidden by the Constitution of the United States; consequently, that the statute as it now is, and under which the appellants were arrested at Astoria and placed against their will on the barkantine Arago, is null and void, and their refusal to work on such vessel after being forcibly returned to it could not be made a public offence authorizing their subsequent arrest at San Francisco.

I dissent from the opinion and judgment of the court.

MR. JUSTICE GRAY was not present at the argument, and took no part in the decision of this case.