## Ex parte LLOYD.

District Court, E. D. Kentucky.
March 19, 1936.

Derond DeWeese and Eldon S. Dummit, both of Lexington, Ky., for petitioner.

Mac Swinford, U. S. Dist. Atty., of Lexington, Ky., for respondent Dr. Lawrence Kolb.

FORD, District Judge.

This is a petition for a writ of habeas corpus filed by Emery Lloyd, an inmate of the United States Narcotic Farm at Lexington, Ky.

The petitioner charges that he has never been tried or convicted of any crime, yet he is imprisoned and restrained of his liberty by the superintendent of the United States Narcotic Farm at Lexington, Fayette County, Ky., and that such detention is in violation of his rights under the Constitution of the United States.

In response to a rule to show cause why the writ of habeas corpus should not be granted, the respondent, Dr. Lawrence Kolb, medical officer in charge of the narcotic farm, while in effect admitting the compulsory detention of the petitioner, asserts the right to so detain him under the provisions of the Act of Congress of January 19, 1929, c. 82, 45 Stat. 1085–1089 (title 21, §§ 221–237, U.S.C.A.).

The response alleges, in substance, that on December 10, 1935, the petitioner Emery Lloyd made application to the Secretary of the Treasury for admission to the narcotic farm for the purpose of receiving treatment for his addiction to the use of narcotic drugs; that, upon medical examination, it was ascertained that the petitioner was an addict to the use of such drugs and in need of such treatment; that, thereafter, upon the petitioner's application and the disclosure of said facts to the Secretary of the Treasury, authority was given for his admission upon the condition, however, that he agree and obligate himself to submit to confinement at the farm for such period as was estimated by the Surgeon General to be necessary to effect a cure of his addiction or until he ceased to be an addict within the meaning of the law; that upon these conditions being made known to the petitioner, he signed a writing by which he agreed to comply with said conditions in consideration of admission to the farm, and thereby granted to those lawfully in charge of the farm authority to use any reasonable method of restraint to prevent the petitioner's departure until eligible for release, under the terms and conditions of his contract. It is further alleged that, upon the execution of said agreement, the petitioner was admitted to the institution as a volun-

tary patient and is now so held and detained under medical treatment for his particular type of addiction; that the period estimated by the Surgeon General for his cure has not expired; that at the present time he is still an "addict" with extremely unstable personality, with inebriate impulses and emotional instability; that he has not received the maximum benefit of the prescribed treatment and in the opinion of the medical board should not be dismissed or released from the institution.

The sufficiency of this response to show legal warrant for petitioner's detention or to deprive him of the right to a writ of habeas corpus and to be discharged thereunder is challenged by demurrer.

It appears that the narcotic farm at Lexington, wherein the petitioner is detained, was constructed by the federal government primarily for the confinement and treatment of prisoners convicted of offenses against the United States who are addicted to the use of habit-forming narcotic drugs. The confinement and treatment of addicts who voluntarily submit themselves to the institution is expressly authorized but is clearly a secondary consideration.

The act, pursuant to which the institution has been constructed and is maintained, vests its control and management in the Secretary of the Treasury with authority to him to appoint all necessary officers and employees and to promulgate all necessary rules and regulations for the care, treatment, government, and discipline of the inmates, suitably designed to rehabilitate and restore them to health.

By section 9 of the act (title 21 U.S. C.A. § 229) it is provided that the inmates shall be employed in such industries, factories, or shops for the manufacture of articles, commodities, or supplies for the United States government as may be provided and established on the farm. For such labor the inmates or their dependents shall receive such compensation as the Secretary of the Treasury may deem proper.

The term "addict," within the meaning of the act (section 1 [21 U.S.C.A. § 221]), is defined as "any person who habitually uses any habit-forming narcotic drug as defined in this chapter so as to endanger the public morals, health, safety, or welfare, or who is or has been so far addicted to the use of such habit-forming narcotic drugs as to have lost the power of self-control with reference to his addiction."

Section 11 of the act (title 21 U.S.C.A. § 231) makes provision for prisoners committed under sentence for crime, who during the service of their sentence have not been cured of their addiction to receive further treatment as voluntary inmates.

The provisions regulating the admission of addicts who are not prisoners and who have not been convicted of any offense against the United States are contained in section 12 of the act (title 21 U.S.C.A. § 232). This section authorizes such persons to apply to the Secretary of the Treasury or his authorized representative for admission. It provides for an examination by the Surgeon General or his authorized agent to determine whether the applicant is an addict within the meaning of the law and whether his addiction is susceptible of a cure by treatment at the institution, together with the estimated length of time necessary to effect such a cure. Upon receiving such application and report, the Secretary of the Treasury is authorized, in his discretion, if room is available, to admit the applicant to the institution. Then follows this provision: "No such addict shall be admitted unless he voluntarily submits to treatment for the maximum amount of time estimated by the Surgeon General of the Bureau of the Public Health Service as necessary to effect a cure. * * * Provided, That if any addict voluntarily submits himself to treatment he may be confined in a United States narcotic farm for a period not exceeding the maximum amount of time estimated by the Surgeon General of the Bureau of the Public Health Service as necessary to effect a cure of the addiction or until he ceases to be an addict within the meaning of this chapter: And provided further, That any person who voluntarily submits himself for treatment at a United States narcotic farm shall not forfeit or abridge thereby any of his rights as a citizen of the United States; nor shall such submission be used against him in any proceeding in any court, and that the record of his voluntary commitment shall be confidential and not divulged."

It is apparently the contention of the respondent that the purpose of the act, properly interpreted, is to authorize specific enforcement of the terms and conditions of the contract entered into by a voluntary inmate by subjecting him to compulsory confinement at the institution for the time specified in the contract. Such interpreta-

tion, if adopted, would necessarily carry with it the implication of power to enforce upon such voluntary inmate all prescribed rules and regulations, including the power to coerce labor in shops, factories, or other industries established on the farm for the manufacture of commodities and supplies for the United States government upon such terms of compensation as the Secretary of the Treasury, in his discretion, may provide.

That such a construction of the act would encounter serious, if not fatal, constitutional barriers to its validity, is scarcely open to doubt. To give rise to such doubts, it is only necessary to refer to the Fifth Amendment providing that no person shall be deprived of liberty without due process of law, and to the Thirteenth Amendment providing that involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall not exist within the United States or any place subject to their jurisdiction.

The fact that the petitioner at some previous time consented to submit himself to confinement does not withdraw the present imprisonment, which is now enforced against his will, from the condemnation of these provisions of the Constitution. The full intent of the constitutional provisions could be defeated with obvious facility if citizens could be held to involuntary servitude or enforced imprisonment, through the guise of such contracts. The contract exposes the petitioner to liability for any damages suffered as the result of the breach but not to involuntary servitude in any form nor to the loss of his liberty or any of its essential attributes without due process of law. Bailey v. Alabama, 219 U. S. 219, 31 S.Ct. 145, 55 L.Ed. 191; Clyatt v. United States, 197 U.S. 207, 25 S.Ct. 429, 49 L.Ed. 726; United States v. Reynolds, 235 U.S. 133, 35 S.Ct. 86, 59 L.Ed. 162, and Allgeyer v. Louisiana, 165 U.S. 578, 17 S. Ct. 427, 41 L.Ed. 832.

In the case of Ex parte McClusky (C. C.) 40 F. 71, 74, the court said:

"Has any person the right to surrender his liberty * * * secured to him * * by the fifth amendment to the constitution of the United States? No man or no power has the right to take away another's liberty, even though with consent, except by due process of law. Due process of law, in a case like the one charged against petitioners, means compliance by the government with a fundamental requisite, such as that the party shall be charged with the crime in the way provided by the constitution and laws of the United States. Liberty, under such constitution and laws, is an inalienable prerogative, of which no man by mere agreement can divest himself. Any divestiture not occurring by due process of law is null. 1 Whart.Crim.Law (9th Ed.) § 145. * * *

"In this country the state and the law have such a great interest in the life and liberty of the citizen as to see to it that such life or liberty shall not be taken away, even with the consent of the citizen, in violation of one of the great constitutional fundamental requisites regulating the method to be adopted to deprive the citizen of his life or his liberty. Mr. Blackstone (1 Comm. 133) again declares that the 'natural life, being an immediate donation of the Great Creator, cannot legally be disposed of or destroyed by any individual, neither by the person himself nor by any other of his fellow-creatures, merely upon their own authority.' So it is with the liberty of the citizen. It is a donation of the Great Creator, and cannot be taken by persons upon their own authority, even with the consent of the citizen, whose liberty is taken; but it must be taken by due process of law."

In a case styled In the Matter of Walter Baker, 29 How.Prac.(N.Y.) 485, the Supreme Court of New York had under consideration a case strikingly similar in its facts to this case. By an act of the Legislature of New York of 1857, the New York State Inebriate Asylum was authorized to receive and retain all inebriates who might enter it voluntarily. One Walter Baker became an inmate of the asylum as a voluntary patient and executed a writing in the following terms: "I hereby agree to place myself under the control and medical treatment of the New York State Inebriate Asylum for the period of one year, to be governed by the rules and regulations of the said inebriate asylum." Before the expiration of the year, he filed a petition for habeas corpus. In sustaining the writ and ordering the discharge of the petitioner, the court said:

"All men are endowed by their Creator with the inalienable right to liberty; and with certain exceptions no contract which deprives a person of his liberty can be specifically enforced by the judgment or order of a court that he shall specifically perform it; and as a general rule force cannot be

used to compel any person to perform such a contract.

"Baker has not done any act by which he has forfeited his liberty, and I am of the opinion the contract he made with the inebriate asylum does not justify that institution in keeping him there by force. He was a voluntary patient in the institution, and all the power the superintendent had under the laws for the government of the institution, was to 'receive and retain' him so long as he was willing to remain. No provision has been made for the arrest of any voluntary patient who leaves the institution, who is capable of taking care of himself, and of managing his own business affairs, and no principle of the common law is applicable to such a person which justifies the arrest and detention of persons who are lost to self control. * * *

"All statutes in restraint of liberty must be strictly construed. This is a principle which cannot be disregarded, and it must be applied in construing the authority conferred upon the inebriate asylum to 'receive and retain' inebriates who enter it voluntarily. The power given to 'retain' such patients, in my judgment, only confers the right upon the superintendent of the institution to keep them so long as they will voluntarily remain, and no longer.

"My conclusion is, that the superintendent of the asylum has no right forcibly to retain Baker in the institution, and that an order should be made discharging him from the asylum unless he chooses to remain there voluntarily, and obey the rules and regulations of the institution."

From the fact that an act of Congress has authorized the making of a certain character of contract, it does not follow, by mere implication, that Congress intended to grant to one contracting party the power or authority to use force or coercion upon the other party to prevent his breach of the contract. Nothing less than compelling language would justify the conclusion that Congress intended or contemplated the grant of a power so inconsistent with the universally recognized rights and relations of contracting parties.

That guaranteed constitutional rights embrace the right not only to make contracts but also to terminate or renounce them, leaving the remedy for the breach to civil damages, subject only to the jurisdiction of equity to decree specific performance in proper cases, has been so often recognized and acted upon as to admit of

no further doubt. Gillespie v. People, 188 Ill. 176, 58 N.E. 1007, 52 L.R.A. 283, 80 Am.St.Rep. 176, and State v. Julow, 129 Mo. 163, 31 S.W. 781, 29 L.R.A. 257, 50 Am.St.Rep. 443.

In response to the argument that the beneficial effect of the act as a regulatory measure, designed to promote law observance, good order, morals, peace, and safety, is defeated, without the power to enforce observance of submission agreements in cases of voluntary patients, it seems only necessary to point out that under our constitutional system the power to regulate such matters within the several states is not delegated to the federal government but is reserved to the States. United States v. Cruikshank, 92 U.S. 542, 23 L. Ed. 588; Slaughter House Cases, 16 Wall. 36, 21 L.Ed. 394, and United States v. De Witt, 9 Wall. 41, 19 L.Ed. 593. And, even under the broad range of the police power inherent in the sovereignty of the states, no encroachment may be made upon any of the just rights of a citizen which the Constitution intended to secure against abridgment. Henderson v. New York, 92 U.S. 259, 23 L.Ed. 543, and Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205.

Indeed, the fact that the federal laws regulating, within the several states, the possession of and traffic in narcotic drugs (not constituting foreign or interstate commerce), have been upheld, is entirely due to their character as revenue measures. Their constitutional support rests only in the taxing power granted by the Constitution to the federal government. Such results as are derived from them within the several states in the promotion of peace, morals, and general good order, are merely incidental and afford no basis for their constitutional validity. Linder v. United States, 268 U.S. 5, 17, 45 S.Ct. 446, 69 L.Ed. 819, 39 A.L.R. 229.

The lack of analogy between the case at bar and that of sailors, dealt with in the case of Robertson v. Baldwin, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715, and that of soldiers, referred to in the Selective Draft Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas.1918B, 856, and cases dealing with minors, apprentices, idiots, and lunatics, is so obvious that we need not pause to discuss their recognized exceptional status.

Any purpose or intent to authorize compulsion or penal action, in connection with the enforcement of a contract provid-

ing for voluntary submission to the institution, which might be implied from the provisions making such a contract a condition of admission, is clearly removed by the following proviso: "any person who voluntarily submits himself for treatment at a United States narcotic farm shall not forfeit or abridge thereby any of his rights as a citizen of the United States." 21 U.S.C.A. § 232.

As further evidence of the lack of intention on the part of Congress to authorize compulsory confinement of voluntary patients, the section (21 U.S.C.A. § 235) which provides punishment for prisoners who escape provides no punishment for voluntary patients who may escape.

A final and convincing indication of the intention of Congress to render it impossible for a contract for voluntary submission to the institution to be used as a means or basis of coercion or oppression or of enforcing any legal demand or exaction whatever upon the voluntary inmate, against his will, is the express provision of the act, in terms commanding and mandatory, that such voluntary submission shall not "be used against him in any proceeding in any court, and that the record of his voluntary commitment shall be confidential and not divulged." 21 U.S.C.A. § 232.

Under these provisions of the act, it is imperative that the petitioner's contract be not used against him in this proceeding, nor in any proceeding in any court. Being thus deprived of the contract as a basis for the response in this proceeding, the respondent is left entirely without warrant for the detention of the petitioner.

Compulsory detention of a voluntary patient in the institution, as a means to accomplish his enforced observance of the terms and conditions of his contract of admission, is entirely out of harmony with the letter as well as the manifest spirit of the law. The act is charitable and benevolent in respect to voluntary patients and not penal or criminal in its nature.

Of course, as "master in its own house," the government may fix the terms and conditions upon which admission to the narcotic farm and the privilege of sojourning there may be granted to those who voluntarily seek to avail themselves of its benefits and opportunities for treatment. As respects such patients, compliance with such terms and observance of all prescribed rules and regulations may be enforced so long as they voluntarily remain as patients or inmates of the institution, but no longer.

Although the privilege of abiding at the farm may be denied or withdrawn, I am of the opinion that the law does not authorize coercion of continued acceptance of the government's charity and benevolence by subjecting voluntary patients to compulsory confinement or detention at the institution, even though such enforced confinement may be for their personal welfare and in specific performance of the patient's agreement to submit thereto.

This construction of the statute gives full effect to that particular provision of the act which was clearly designed to preserve all constitutional rights of voluntary inmates and avoids the danger, hereinbefore pointed out, of serious conflict with the Fifth and Thirteenth Amendments to the Constitution of the United States. To so construe the statute is in observance of the familiar admonition that "a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." United States v. Jin Fuey Moy, 241 U.S. 394, 401, 36 S.Ct. 658, 659, 60 L.Ed. 1061, Ann.Cas.1917D, 854; United States v. Delaware & Hudson Co. 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836.

It follows that the demurrer to the response should be sustained and the petition for the writ of habeas corpus should be granted. If, upon its return, no additional facts are shown to justify the detention of the petitioner, an order will be entered directing his forthwith release.