**In re The COMPLAINT OF UNCLE SAM OF '76, INC., late owner of the F/V Italian Gold, for exoneration from and limitation of liability.**

**Civil Action No. 94–12138–REK.**

United States District Court,
D. Massachusetts.

April 16, 1996.

testimonial evidence, the court has come to the findings and conclusions recited in this Opinion as to how the settlement fund should be distributed.

Joseph A. Regan, Pettingell & Regan, Boston, MA, for Plaintiff.

Michael B. Latti, Latti Associates, Boston, MA, for Joanne Giovinco.

Michael B. Latti, Latti Associates, Boston, MA, Stephen M. Ouellette, Cianciulli & Ouellette, P.A., Beverly, MA, for Maria Ramos Carrapichosa.

Joseph G. Abromovitz, Abromovitz & Leahy, P.C., Boston, MA, for Donna Curcuru.

Joseph M. Orlando, Orlando & Associates, Gloucester, MA, for Vera A. Curcuru.

Sivapiragasam Kandasamy, Commonwealth of Massachusetts Department of Public Welfare, Boston, MA, for Commonwealth of Massachusetts Department of Transitional Assistance.

### Opinion and Order

KEETON, District Judge.

On September 5, 1994, the 69–foot fishing trawler F/V Italian Gold sank off the coast of Massachusetts. All four crew members aboard the ship were lost and presumed drowned. This civil action was commenced to allocate a settlement fund among the representatives and survivors of the lost crew members.

On February 16, 1996, four claimants representing the crew members and their surviving family members appeared before the court for a hearing on proposals for allocating the limited settlement fund that Petitioner tendered in this limitation-of-liability proceeding. The court heard live testimony from each of the claimants regarding the support, nurture, and guidance each decedent provided to his family. In addition, the court received and has considered financial and personal documents regarding the income of each of the decedents, the composition of his family, and his vital statistics. After considering all of this documentary and

**I**

■ Under both the Jones Act and the Death on the High Seas Act, recoverable damages are limited to (1) an award for the conscious pain and suffering of *the decedent* before his death, and (2) actual pecuniary loss of *the survivors* as a result of his death. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). The court received and considered evidence on both of these elements of recoverable damages.

Having considered all of the evidence presented, in court and through written submissions, the court has arrived at presumptive findings of fact for the purpose of allocating the limited settlement fund. As explained further below, the court makes the findings as to amounts of damages stated in this Opinion solely for the purpose of determining the percentages of the settlement fund to which the four sets of claimants now before the court are respectively entitled. These are presumptive findings, determined on the basis of evidence the parties were able to place before the court without the heavy commitment of resources, both private and public, that would have been essential to preparing for and completing a full evidentiary hearing in which all interested parties had an opportunity to participate and develop their respective positions exhaustively. Explicitly, this court is not determining finally the actual amount of damages suffered by any claimant or set of claimants.

Support for a court's proceeding in this manner appears in two branches of precedent. These two branches bear upon historical sources of jurisdiction and authority of United States District Courts in equity and admiralty, respectively.

Equitable proration of limited funds was applied early in the 20th century in the surety-bond context. *See, e.g., Guffanti v. National Surety Co.*, 196 N.Y. 452, 90 N.E. 174 (1909). Later developments, after liability insurance had become more pervasive

and problems of preferential settlement among claimants to limited coverage increased, involved proration of potential liability insurance benefits. In some jurisdictions, problems associated with risks of preferential settlement were addressed by using some form of proration, rather than a "first come, first served" rule, which would have recognized priority among claimants in the order in which they reduced their claims to judgment. *See, e.g., Moore v. McDowell,* 54 Mich.App. 657, 221 N.W.2d 446 (1974) (equitable principles motivated a pro rata distribution of funds deposited in court by a liability insurer despite the status of some claimants as judgment creditors); *Burchfield v. Bevans,* 242 F.2d 239 (10th Cir. 1957). For a collection of authorities and a more extended development of arguments regarding principles of allocation, see Robert E. Keeton and Alan I Widiss, *Insurance Law* §§ 7.4(d)–(f) (1988).

A central tenet of admiralty jurisprudence is that seamen are wards of admiralty. *Robertson v. Baldwin,* 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715 (1895). The concerns of admiralty for protection of its wards extends also to protecting the legal rights of a seaman's survivors and dependents when the seaman is lost at sea. Thus, a district court sitting in admiralty has discretion at least, if not an obligation, to take reasonable steps to ensure that the survivors and dependents of a seaman lost at sea receive a fair share of limited settlement funds available to provide support for many claimants.

With this background of support in precedent and in principle, the court has proceeded in the manner described in this Opinion so as to avoid the costs to the parties and to the public of holding a full evidentiary hearing to determine, with precision, the actual amount of damages of each claimant. Such a full evidentiary hearing would have consumed public and private resources far out of proportion to any purpose that might have been served more effectively by determinations made after more exhaustive proceedings than by these presumptive determinations.

The commitment of resources to a full evidentiary hearing would have dramatically reduced the already limited settlement fund available for distribution. Also, a full evidentiary hearing in which only those claimants now before this court participated—thus allowing no opportunity for other potentially interested parties to be heard—would have left to future determinations, in this or one or more other forums, seriously debatable contentions regarding issue preclusion and claim preclusion.

By proceeding with presumptive findings of fact for the purpose of a presumptive allocation of percentages of interests in a limited settlement fund, a federal district court sitting in an admiralty proceeding may protect the interests of wards of admiralty. In this way, the limited settlement fund may be equitably allocated without a resulting depletion of the fund that would frustrate the objective of using as much as possible of that fund for the benefit of claimants, rather than for attorney fees, costs, and other expenses.

The methodology employed in arriving at these presumptive findings, as explained in this Opinion, is designed to yield a distribution very close to the distribution that would be likely to result from a full evidentiary hearing. The court finds by a preponderance of the evidence that no claimant or set of claimants would receive more money from an allocation based on shares determined after a full evidentiary hearing than that claimant or set of claimants will receive from the settlement fund if the distribution is made on the basis of these presumptive findings. These presumptive findings include findings as to all potential elements of recoverable damages, including conscious pain and suffering of decedents, and pecuniary losses of all survivors.

## II

The court finds that it is more probable than not that each of the four crew members experienced conscious pain and suffering before his death. The court also finds that this pain and suffering was most likely endured for a matter of minutes, rather than hours or days. The court finds, as well, that it is more probable than not that each of the crew members suffered equally.

Claimant Vera Curcuru has asserted that her deceased husband, crewman Salvatore Curcuru, suffered greater conscious pain and suffering than the other crew members. As evidence for this contention, Vera Curcuru points to the fact that her husband is the only one among the four deceased crewmen whose body has been recovered. Moreover, Salvatore Curcuru's body, when recovered, was not in the ship. Vera Curcuru argues that this fact supports a finding that her husband was the only one among the four who was separated from the ship before he died and that he suffered for a longer time before he eventually drowned.

The court finds, however, that the two items of evidence upon which Vera Curcuru relies do not warrant an inference that Salvatore Curcuru suffered greater conscious pain and suffering than the other three crew members. It would be pure speculation, not supported by evidence, to suppose that the circumstances as to finding his body and where it was found made it more or less likely that he endured more intense suffering or suffering for a longer period of time. Instead, the court finds that, more likely than not, each of the four crewmen suffered equally. The court finds $25,000.00 to be a fair and reasonable presumptive finding as to the amount needed to compensate in full the estate of each deceased crew member for conscious pain and suffering endured by that crew member before his death.

### III

As stated above, the second measure of damages allowed under the Jones Act and the Death on the High Seas Act is actual pecuniary loss of the survivors. In addition to any direct expenses as a result of the death (such as funeral expenses), pecuniary loss encompasses harm usually described as "loss of support." The court here undertakes to determine, presumptively, the amount of monetary support that each decedent would have provided for his family had he not died.

As explained in Part I, because the settlement fund is indisputably insufficient to compensate all claimants for the full value of their pecuniary losses, the actual amount of total pecuniary loss of each claimant is not of paramount significance in this allocation proceeding. The important measurement is the relationship to each other of the various amounts of pecuniary losses among the claimants. It is the determination of relative amounts that would be awarded for losses for all claimants (including conscious pain and suffering, considered in Part II, as well as pecuniary losses considered here, in Part III) that will allow an equitable distribution of the limited settlement fund.

For these reasons, the court does not undertake to determine with precision the wage trends of fisherman in general or the possibility that incomes in the fishing industry might or might not out-pace inflation. To the extent that any of the decedents could have expected an increase in income, all of the decedents would have expected approximately the same proportional increases. All of the decedents were involved in the same industry and would have experienced similar ebbs and swells in income. The relationship among awards would remain substantially the same, as far as can reasonably be predicted. Moreover, any differences among the decedents as to age and work expectancy would relate only to predictions of income for the distant periods in the future as to which evidence for reasoned findings would be least cogent, even after a full opportunity for the most exhaustive evidentiary hearing.

For the same reason, the court does not undertake to determine the actual amount of taxes that would have been paid by each decedent. Although there were differences in the incomes among the decedents, these differences were not so great as to affect substantially the proportion of their respective incomes paid in taxes. The four decedents were essentially in the same "tax bracket" even though their incomes were not identical. To the extent that taxes would have affected the level of support each decedent would have been able to provide his family, the effect would have been relatively proportional. Thus, for the purpose of allocating shares of a limited settlement fund, evidence of pre-tax income will be a sufficient proxy for the effect of taxes on presumptive findings as to actual support.

68

Finally, the evidence before the court showed that each of the decedents was a dedicated family man, able and willing to provide monetary and emotional support to all of his family members. All of the decedents, moreover, were able and willing to provide guidance to any children within their respective family groups. The evidence shows that, more likely than not, each of the decedents would have used or saved a majority of his income for the benefit of his family.

In these circumstances, a rationally chosen starting point for determining the level of support that each decedent would have provided to his family is the average annual pre-tax income of each decedent. Under the methodology used here, from this average annual amount is to be subtracted an estimate of the amount of money each decedent would have spent on himself. An addition is then made for the value of services that each decedent would have provided around the house and elsewhere for his family. The resulting figure is the average yearly support provided by each decedent.

This average yearly support figure is multiplied by the expected working life of each decedent. The calculation is not a simple multiplication, however, because the total must be discounted to account for real (after inflation) interest (or discount) rates. In this instance, the court has determined that a 2% real discount rate is appropriate. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 548–49, 103 S.Ct. 2541, 2556–57, 76 L.Ed.2d 768 (1983).

**IV**

The court finds by a preponderance of the evidence that each of the decedents spent much of his time each year working on the high seas. Thus, each decedent had less time than most non-seamen workers to spend money on himself. Each of the four decedents used a majority of his earnings for his family.

The decedents with minor children were likely to save an even greater proportion of their incomes for their family and to spend less money on themselves.

There is relatively little evidence before the court, however, to distinguish among the decedents with respect to the level of services provided by each to his family. The court finds, by a preponderance of the evidence, that each decedent helped with repairs, gardening, and other jobs around the family home. The evidence before the court also shows that, more likely than not, all four decedents contributed comparably as to services provided around the house and in the community. The court finds that an amount of $2,000 per year is an appropriate valuation of the services provided by each decedent to his family for work around the family home.

The resulting computations for total pecuniary loss to each of the four claimants in this case, based on this methodology and calculus, are explained below, one by one.

*A. Decedent Peter Giovinco*

On the date of his death, Peter Giovinco was 35 years old. His family included his wife Joanne and his three minor children, Dominic, Francesco, and Pietro. Evidence before the court showed that two of these children have special educational needs.

Peter Giovinco was an engineer on the fishing vessel. His expected work life at the time of his death was 25.3 years. His average annual income for the period of 1991–1994 was $46,636.63. Taking account of the fact that he was responsible for supporting a wife and three minor children (two of whom had special needs), and also taking into account that he spent most of his time at sea where his employer provided for his maintenance and personal needs, the court finds that, more likely than not, Peter Giovinco would have spent only 10% of his yearly income on himself. Thus, his average yearly monetary support to his family would have been 90% of $46,636.63, which is $41,972.97. The calculation of pecuniary loss to his survivors is thus:

$41,972.97 average monetary support
+ 2,000.00 value of services provided
$43,972.97 yearly monetary support

The present value of 25.3 years of support, at $43,972.97 per year, discounted at a real interest rate after inflation of 2% per year is: $853,384.06. This total represents the pre-

sumptively determined total pecuniary loss to the survivors of Peter Giovinco, as calculated for this comparison among sets of claimants.

### B. Decedent Manuel F.G. Carrapichosa

At his death, Manuel F.G. Carrapichosa was survived by his wife Maria, his daughters Armanda (age 30) and Ana (age 28), and his minor son Manuel (age 15). Manuel F.G. Carrapichosa was 55 years old when he died. His son was his only dependent child.

Manuel F.G. Carrapichosa was the ship's cook. At age 55, he had an expected working life of another 8.9 years. His average annual income from 1991–1994 was $29,040.84. He was responsible for supporting one dependent child and his wife. The court finds that Manuel F.G. Carrapichosa would have spent 20% of his income on himself, saving or using 80%—$23,232.67—for his family. Thus, the calculation of his total support is:

| | |
|---|---|
| $23,232.67 | average monetary support |
| + 2,000.00 | value of services provided |
| $25,232.67 | yearly monetary support |

The present value of 8.9 years of support, at $25,232.67 per year, discounted at a real interest rate after inflation of 2% per year is: $181,573.14. This total represents the presumptively determined total pecuniary loss to the survivors of Manuel F.G. Carrapichosa, as calculated for the comparison among sets of claimants.

### C. Decedent Nicholas Curcuru

Nicholas Curcuru was the captain of the F/V Italian Gold on its final voyage. He was survived by his wife Donna, his daughter Carla (age 20), and his son Nicholas (age 7). Carla was still a dependent and was enrolled in college when her father died.

At his death, Nicholas Curcuru was 48 years old. His expected working life was an additional 14.1 years. His average annual income for the period of 1991–1994 was $51,205.75. Nicholas Curcuru was responsible for supporting his wife and two minor children, one of whom was in college. The court finds that he would have spent 15% of his income on himself, saving or using 85% for his family. Thus, Nicholas Curcuru's aver-

age annual monetary support to the family would have been $43,524.89. The calculation of his total support is:

| | |
|---|---|
| $43,534.89 | average monetary support |
| + 2,000.00 | value of services provided |
| $45,534.89 | yearly monetary support |

The present value of 14.1 years of support, at $45,534.89 per year, discounted at a real interest rate after inflation of 2% per year is: $550,156.39. This total represents the presumptively determined total pecuniary loss to the survivors of Nicholas Curcuru, as calculated for the comparison among sets of claimants.

### D. Decedent Salvatore Curcuru

Salvatore Curcuru (no relation to Nicholas Curcuru) was survived by his wife Vera and two sons from his first marriage. Neither of the two sons was dependent on Salvatore Curcuru, so he was responsible for supporting only himself and his second wife, Vera.

At his death, Salvatore Curcuru was 55 years old. His expected working life as a commercial fisherman was an additional 8.9 years. For the period of 1991–1994, Salvatore Curcuru's average annual pre-tax income was $25,452.22. Taking into account that he did not have any dependent children to support, I find that Salvatore Curcuru would have spent 30% of his income on himself alone, 10% more as his allocated share of funds spent on himself and his wife together, leaving 60% saved and used for the benefit of his wife. Thus, the average annual monetary support he would have provided to his wife was $15,271.33. The calculation of his total support is:

| | |
|---|---|
| $15,271.33 | average monetary support |
| + 2,000.00 | value of services provided |
| $17,271.33 | yearly monetary support |

The present value of 8.9 years of support, at $17,271.33 per year, discounted at a real interest rate after inflation of 2% per year is: $124,283.72. This total is not the total pecuniary loss to the survivor of Salvatore Curcuru, however, because Vera Curcuru also had to pay funeral expenses after her husband's body was found. Those funeral expenses amounted to $804.10. Thus, the presumptively determined total pecuniary loss to

Vera Curcuru was $125,087.82, as calculated for the comparison among claimants.

## V

The award to each claimant will take two forms. First, the amount for conscious pain and suffering of the decedents—$25,000 to each decedent—is awarded to the estate of the decedent. Second, the amount for pecuniary loss of the survivors is awarded directly to each claimant. After hearing testimony from the widows of the decedents, the court finds that the natural mother of each minor child has that child's best interests at heart and will provide adequately for her children. Therefore, the court need not make distinct allocations for spousal support and child support. The court determines that it is appropriate to award all of the pecuniary-support allocation to the natural mother with the understanding that the mother will use these funds to support the family, including both herself and her children.

In summary, the presumptively determined total damages awards for comparison purposes, for both conscious pain and suffering of the decedents and pecuniary loss of the survivors, are the following:

| | |
|---|---|
| Estate of Peter Giovinco | $25,000.00 |
| Estate of Manuel F.G. Carrapichosa | 25,000.00 |
| Estate of Nicholas Curcuru | 25,000.00 |
| Estate of Salvatore Curcuru | 25,000.00 |
| Joanne Giovinco | 853,384.06 |
| Maria Carrapichosa | 181,573.14 |
| Donna Curcuru | 550,156.39 |
| Vera Curcuru | 125,087.82 |
| **Total** | **$1,810,201.41** |

As noted earlier, however, the total amount of damages calculated above exceeds the amount of the limited settlement fund. Given this unfortunate, but inescapable fact, the above total awards cannot be paid in full. Instead, the settlement fund is to be distributed among the claimants in the following proportions:

| | |
|---|---|
| Estate of Peter Giovinco | 1.4% |
| Estate of Manuel F.G. Carrapichosa | 1.4% |
| Estate of Nicholas Curcuru | 1.4% |
| Estate of Salvatore Curcuru | 1.4% |
| Joanne Giovinco | 47.1% |
| Maria Carrapichosa | 10.0% |
| Donna Curcuru | 30.4% |
| Vera Curcuru | 6.9% |
| **Total** | **100.0%** |

## VI

At the end of the hearing on February 16, 1996, the court did not close the evidence. Instead, the court allowed Vera Curcuru until March 1, 1996 to file additional financial and personal submissions. Documents that Vera Curcuru wished to file included the Certificate of Divorce Absolute of Salvatore Curcuru from his first wife and various tax records that were previously missing.

On February 23, 1996, Vera Curcuru filed the Certificate of Divorce Absolute (Docket No. 39), and on March 1, 1996, she filed a compilation of W-2 forms for the years 1987–1994 (Docket No. 43). In a letter attached to the March 1 submission, however, Vera Curcuru informed the court that a full set of tax returns would not be available from the Internal Revenue Service for an additional 4–6 weeks.

Claimants Giovinco, Carrapichosa and Donna Curcuru have filed a "Motion in Opposition to Keeping the Record Open in Order for Claimant to File Tax Returns." (Docket No. 44, filed March 6, 1996). In this motion, the three other claimants ask the court to apportion the settlement fund based on evidence now before the court, without waiting for the additional tax returns.

In light of the court's determination that tax information is unnecessary for a fair distribution of the settlement fund, the W-2's submitted by Vera Curcuru are sufficient for the court to make the appropriate findings. The above distribution was determined on the basis of the record now before the court, not including the full copies of the tax returns. Vera Curcuru's request to hold the record open for an indefinite period of time is denied, and the other claimants' motion in opposition to keeping the record open is dismissed as moot.

## ORDER

For the foregoing reasons, it is ORDERED:

(1) Claimant's Joanne Giovinco's, Maria Carrapichosa's and Donna Curcuru's Motion in Opposition to Keeping the Record Open in Order for Claimant to File Tax Returns

(Docket No. 44, filed March 6, 1996) is DISMISSED AS MOOT.

(2) The parties are entitled to a distribution of the settlement fund among the representatives and survivors of the decedents in the following proportions:

| | |
|---|---|
| Estate of Peter Giovinco | 1.4% |
| Estate of Manuel F.G. Carrapichosa | 1.4% |
| Estate of Nicholas Curcuru | 1.4% |
| Estate of Salvatore Curcuru | 1.4% |
| Joanne Giovinco | 47.1% |
| Maria Carrapichosa | 10.0% |
| Donna Curcuru | 30.4% |
| Vera Curcuru | 6.9% |